BURKETT v. NEW YORK LIFE INS. CO.

No. 6372.

Circuit Court of Appeals, Fifth Circuit.

Feb. 10, 1932.

Rehearing Denied March 4, 1932.

Robt. L. Bullard and Luther A. Smith, both of Hattiesburg, Miss., for appellant.

William H. Watkins, of Jackson, Miss., for appellee.

Before BRYAN, SIBLEY, and WALKER, Circuit Judges.

WALKER, Circuit Judge.

This was an action by the appellant, the beneficiary named in a policy issued by the appellee on the life of R. Lee Burkett, who was the husband of the appellant. By the terms of the policy the sum of $5,000 was payable upon appellee's receipt of due proof of the death of the insured, and an additional $5,000, called "Double Indemnity," was payable upon receipt of due proof "that the death of the insured resulted directly and independently of all other causes from bodily injury effected solely through external, violent and accidental means and occurred within ninety days after such injury." The declaration alleged that on the 1st day of February, 1931, the insured was accidentally killed by a gunshot wound in the head; that the death of the insured was a direct result of that gunshot wound, independent of all other causes, and that death resulted immediately. The appellee put that allegation in issue, and gave notice that in the trial of the cause the appellee, if required to do so, would offer evidence to prove that the insured came to his death solely and only as a result of a gunshot wound intentionally inflicted upon himself. In the trial it was admitted that the single indemnity provided for in the policy had been paid. Evidence without conflict showed the following: At the time of his death the insured was city mail carrier in Columbia, Miss., and had held that position for five years. He lived there with his wife and children in a home owned by himself. He was a man of good character, temperate in his habits, a member of a church, industrious and thrifty. He was devoted to his wife and children, was agreeable in his relations with others, and was highly esteemed in the community in which he lived. Diagonally across the street from the insured's residence was a store kept by Mr. Frank M. Jennings, at which the insured was accustomed to stop every day, frequently more than once a day. About noon on Sunday, February 1, 1931, the insured was in that store. He talked to Mr. Jennings about a gun, and asked him about a double barrel shotgun he saw there. He said some one tried to break in his home one night, that he did not have a gun then, and that he needed one. He did not buy the gun. He said it did not suit him.

The appellant testified that it was about a year and a half before the insured's death that some one tried to break into the house, that since that time no other such attempt was made, and the insured had had no gun in the house. During that Sunday afternoon a brother of the deceased visited him at his home, and the two went from there to the post office, where the insured did some work with his mail for the next day. When they left the post office, they went to the office of Dr. Thompson, the insured's family physician. Dr. Thompson tested the insured's kidneys and said they were all right. They then went to a drug store and insured got a prescription filled. Then they returned to the insured's home. After being at his home about ten minutes, the insured went to the Jennings store, which faced west. At that time Mrs. Jennings was alone in the store. The insured said he wanted to see Frank. Mrs. Jennings said her husband was sick, and was back lying down. The insured said he was sick too. After standing in the store awhile and looking across the street, the insured went behind a counter running east and west, parallel with the north side of the store, in doing so going between that counter where it was opposite the end of another counter running north and south and parallel with the rear or east side of the store. Mrs. Jennings stated that she did not recall that she had ever seen the insured go behind the counter before. He stopped where the gun was lying on a shelf behind the east and west counter, and, as he picked it up, said, "I wanted to see Frank about this gun." Mrs. Jennings said she was positive her husband was asleep. Without asking permission to take the gun away, the insured took it and walked from behind the east and west counter and then on behind the north and south counter. While he was behind the east and west counter, he unbreeched the gun. Mrs. Jennings saw that it then was unloaded. In going from where he got the gun the insured passed where there were some loaded shells kept for sale, some in open boxes. He went on behind the north and south counter to the door near the southeast corner of the store which opened upon a concrete pavement in the rear of the store, which pavement was about level with the store floor, and was

about five feet wide and eight feet long, the room in which Mr. Jennings then was being located north of that pavement. After the insured got outside the store, the report of a gun was heard.

The insured's body was found lying across the cement pavement about three and a half feet from the door through which he had gone in leaving the store. The top of his head from just above his right ear was blown off. Blood and some of his brains were found on the roof, which was about eight feet high. The gun was lying on the walk about three feet from deceased's body; the butt being towards the body. It contained an exploded shell in the right-hand barrel. The shell was of a kind kept in the store for sale. The gun was a cheap one. To shoot it the hammer had to be cocked and the trigger pulled. It was usual for Mr. Jennings to keep it unloaded. He stated that he thought it was not loaded. In the rear of the store next to the concrete walk was a small open space and beyond that thick bushes and trees. Several witnesses testified that there were powder burns on the face of the deceased near the part that was blown off, and that there was a ring on the face like the mark of a gun barrel. Other witnesses, including the undertaker who prepared the body for burial, testified that they did not see powder burns or the mark of a gun barrel on his face. The undertaker said, "There might have been some there I did not see." A gun would have to be very close, less than one foot, to one's face when fired to make powder burns on the skin. A man of the height of the insured, about five feet and seven inches, could fire the gun while in a standing position, the muzzle being so placed with reference to his person that the shot would produce the results shown by the evidence.

Dr. Thompson, the insured's family physician, testified that the insured came to his office on the day of his death, and asked to have his urine examined. The witness did so, found nothing the matter with the insured, and told him so. The insured stated that his hands and feet were cold. The witness explained to him that that was a nervous manifestation, and that for the insured to get better he would have to be in a better frame of mind, and make the effort himself. When witness saw the insured on January 7, 1931, he had had the flu, but was feeling better. When he last saw him, the insured was no more nervous than usual. Being apprehensive as to his physical condition made him more or less nervous. The witness stated: "A neurotic is one who thinks more or less

of himself and his physical condition and is apprehensive of his physical welfare. I would regard him as a neurotic." Several witnesses who saw the deceased during the day of his death stated that he seemed to be normal, there being nothing unusual in his appearance. Dr. Thompson stated that his conversation, demeanor, and attitude were normal, were as usual. At the request of the insured, the witness gave him something for constipation. A witness who qualified as a gun expert testified that the gun would not be fired by being dropped unless it fell directly on the hammer. It would not be fired by the butt hitting a hard surface in falling. A former owner of the gun, who stated that it fired once after he had set it against something, also stated that he did not know whether it was cocked or uncocked when he left it, and that it had fallen when he saw smoke from it after it fired. Upon the conclusion of the evidence, the court, on motion of the defendant, the appellee, directed a verdict in its favor.

■ The burden was on the appellant to prove that the death of the insured "resulted directly and independently of all other causes from bodily injury effected solely through external, violent and accidental means." Evidence so far disclosed circumstances attending the death of the insured that no room was left for a reasonable hypothesis that it was caused by the act of another. The rebuttable presumption against suicide is overcome by evidence showing that the death was self-inflicted, and a finding that the death was accidental cannot properly be made where a fact or circumstance established by uncontroverted evidence is inconsistent with a reasonable hypothesis that it was due to accident. Travelers' Ins. Co. v. McConkey, 127 U. S. 661, 8 S. Ct. 1360, 32 L. Ed. 308; New York Life Ins. Co. v. Bradshaw (C. C. A.) 2 F.(2d) 457; New York Life Ins. Co. v. Weaver (C. C. A.) 8 F.(2d) 680; Ætna Life Ins. Co. v. Tooley (C. C. A.) 16 F.(2d) 243; Frankel v. New York Life Ins. Co. (C. C. A.) 51 F.(2d) 933; Missouri State Life Ins. Co. v. Roper (C. C. A.) 44 F.(2d) 897; Mutual Life Ins. Co. v. Gregg (C. C. A.) 32 F.(2d) 567. The evidence showed nothing inconsistent with the hypothesis that the death was self-caused. The fact that the insured's situation and surroundings were such as to make it seem to others unlikely that his worries about his physical condition would make him wish to take his own life was not inconsistent with the existence of the suicidal intent; it being a matter of common knowledge that persons

who have abundant reasons to be satisfied with their lot in life do commit suicide. Ætna Life Ins. Co. v. Tooley, supra. There was no evidence having any tendency to prove that the gun was fired as a result of the hammer accidentally coming in contact with another object with sufficient force to produce that result. That the firing was so caused is a mere possibility supported by nothing shown by evidence. The idea that the firing was so caused is not reasonably reconcilable with facts established by uncontroverted evidence. The nature of the wound and the fact that blood and brains were found on the roof of the adjoining building show that, when the shot was fired, the insured must have been in a standing position, and that the gun was pointing upward, the muzzle of it being in close proximity to the part of the head which was blown off. Where the insured was when the fatal shot was fired there was, so far as any evidence indicated, nothing except the pavement beneath him with which the hammer accidentally could come in contact with sufficient force to cause the firing. If in an accidental fall of the gun the hammer had struck the pavement with the result that the gun was fired, it is not reasonably conceivable that the shot would have gone in the direction which the evidence showed it went. Other attending circumstances were consistent with the hypothesis that the death was intentionally self-caused. The insured's conduct in going for the gun during Sunday afternoon, in taking it and a loaded shell without asking permission to do so, and then, instead of returning to his home, going to a secluded spot in the rear of a store in an urban business and residence locality, was consistent with the existence of a suicidal intention, and reasonably might be regarded as indicating that the reason stated by the insured for wanting a gun was a pretext used to conceal his real purpose; the mentioned attempt to break into his residence at night having occurred about a year and a half before. The evidence was such that none of it had a substantial tendency to prove that the death was accidentally caused. It appears from the record there was such a preponderance of circumstantial evidence tending to prove that the insured intentionally killed himself, the evidence as a whole being inconsistent with any reasonable hypothesis except suicide, that the court would have been warranted in setting aside a verdict involving a finding that the death was accidentally caused. This being so, and the evidence being such as to leave no room for reasonable and fair-minded men to conclude that appellant had sustained the burden of proving her allegation as to how the death of the insured was caused, the above-mentioned ruling was not erroneous. New York Life Ins. Co. v. Bradshaw, supra; Ætna Life Ins. Co. v. Tooley, supra; Mutual Life Ins. Co. v. Gregg, supra.

The judgment is affirmed.