## NEW YORK LIFE INS. CO. v. KING.
### No. 10877.

Circuit Court of Appeals, Eighth Circuit.
Dec. 14, 1937.

Frank B. Williams, of Springfield, Mo. (William R. Collinson, of Springfield, Mo., Louis H. Cooke, of New York City, and James E. Sater, of Monett, Mo., on the brief), for appellant.

C. Harold Hughes, of Manhattan, Kan. (Charles Hughes, of Manhattan, Kan., on the brief), for appellee.

Before GARDNER, SANBORN, and THOMAS, Circuit Judges.

SANBORN, Circuit Judge.

This is an action at law brought by Amelia W. King, widow of Walter J. King and the beneficiary named in a $5,-000 life policy issued by the New York Life Insurance Company to her husband. The

policy was a Missouri contract and contained a provision for double indemnity if "the death of the insured resulted directly and independently of all other causes from bodily injuries effected solely through external, violent and accidental means." The insured killed himself on November 26, 1934. The beneficiary claimed double indemnity for accidental death on the ground that at the time the insured took his life he was insane. The insurer, while conceding that the death was accidental within the meaning of the policy if the insured was then insane (Von Crome v. Travelers' Ins. Co., 8 Cir., 11 F.2d 350; Scales v. National Life & Accident Ins. Co., Mo.Sup., 212 S.W. 8), denied the insanity of the insured and its liability for double indemnity, and paid to the beneficiary the face of the policy. The beneficiary then brought this action to recover an additional $5,000. The case was tried to a jury, which returned a verdict for the plaintiff beneficiary. From the judgment entered thereon, this appeal is taken.

The appellant assigns as error: (1) The refusal of the trial court to direct a verdict in its favor; (2) certain rulings of that court with respect to the evidence; and (3) certain instructions to the jury.

The main, if not the only substantial, question presented is the sufficiency of the evidence to sustain the verdict that the insured was insane at the time of his death. If there was substantial evidence of insanity, the defendant's motion for a directed verdict was properly denied.

The plaintiff is entitled to have the evidence viewed by this court in the light most favorable to her. Svenson v. Mutual Life Ins. Co. of New York, 8 Cir., 87 F. 2d 441. The burden of establishing that the insured was insane when he shot himself was upon her. Hall v. Ætna Life Ins. Co., 8 Cir., 85 F.2d 447, 451; Metropolitan Life Ins. Co. v. Siebert, 8 Cir., 72 F.2d 6, 7; Supreme Council of Royal Arcanum v. Wishart, 3 Cir., 192 F. 453; Scales v. National Life & Accident Ins. Co., supra, 212 S.W. 8, at page 9.

It is not possible to set forth the evidence in detail in this opinion without unduly extending it. A failure to include, in the abbreviated statement which we shall make, items of evidence regarded as important, is not to be taken as any indication that any of the evidence contained in the record has been overlooked by us in reaching our conclusion.

Briefly and generally, the facts disclosed by plaintiff's evidence and other evidence in the record which is not in dispute are as follows:

The insured at the time of his death was 47 years of age, a college graduate, a civil and mechanical engineer, apparently happily married, who had for some 10 years prior to his death lived in Monett, Mo. He was regularly employed by a contractor named Gillioz as an office engineer. The insured was receiving a salary of $375 a month, and his principal work was estimating the cost of various kinds of construction work for his employer. He had a good head for figures, was accurate in his work, attended to his duties, and was methodical. He was a somewhat reserved and quiet-spoken, but genial, man, who did not indulge in argument, was fond of his friends, a good conversationalist, courteous, and a gentleman. He was neat and clean and careful of his clothes and appearance.

In 1933 he had commenced the construction of an apartment building in Manhattan, Kan., where his wife's family lived. He and his wife had planned this building as an investment for their savings and as a means of enabling the insured ultimately to retire. The building had 14 apartments to be rented and one for a caretaker. Due to difficulties of some kind, work on the building was halted from November, 1933, to May, 1934. The time consumed in the erection of the building and its cost were more than the insured had contemplated. The exact amount which the insured expended in the construction of this building is not shown by the record, but it is evident that he invested substantially all of his available means. In addition, on November 14, 1934, he borrowed $15,000 from the Manhattan Mutual Life Insurance Company upon a 5-year mortgage bearing interest at 6 per cent., gave to the agent who negotiated the loan, a Mr. Bardwell, a $750 commission mortgage payable in semiannual installments, and took care of an unpaid balance of the bill for lumber and material furnished by the lumber company by giving to it a third mortgage for $3,206, due in one year, with interest at 8 per cent. The building cost between $50,000 and $60,000, and was completed by November 14, 1934. Shortly thereafter, all unpaid bills for labor and material were paid from the proceeds of the first mortgage loan, and the insured's entire

349

indebtedness was then represented by the mortgages upon the apartment property. After the completion of the apartment building and before the insured's death, six apartments were rented, a seventh was to be occupied on January 1, 1935, and there was a prospective tenant for another apartment. The insured and his wife had calculated that the rents from the apartments which had been rented would carry the loans and pay the fixed charges of the building and that they would have a "growing investment."

The building and the financing of the apartment house and the delays which occurred were a source of worry to the insured. He did not supervise the work of construction personally, but had much correspondence about it. A brother-in-law acted as superintendent, and from the latter part of September until November 14, 1934, the wife of the insured was supervising the finishing of the construction. She remained in Manhattan until November 23d to take care of unpaid bills for labor and materials.

The insured's letters to Mr. Bardwell with reference to the first mortgage loan and to the payment of bills out of the proceeds are the letters of an intelligent man having a thorough grasp of the subject matter with which he was dealing, but who was worried or annoyed. The title to the land upon which the building was being erected was found by the examiner for the Manhattan Mutual Life Insurance Company to be unsatisfactory, which necessitated a suit to quiet title. Upon being advised of this, the insured wrote in part as follows: "The news that our title is in very poor condition is a hard blow but we can take it and we trust that Mr. Springer can get busy at once on this matter and have the title quieted without delay so that you can still make our loan."

On October 25, 1934, the insured wrote to Mr. Bardwell in part as follows: "I believe somewhat better progress has been made on the building since Mrs. King has been on the job and she will remain there until it is fully completed as we must fully complete this building on or about November 1st, 1934, and I now believe that it will be completed shortly after the first·of the month. The delay has been terrible and has us all going around in circles."

On October 30, 1934, the insured wrote a letter to Walter Lambert, president of the Lambert Lumber Company, in which he said:

"It now appears that $3000 will be all that can be paid on your account and I sincerely trust you can agree to accepting such an amount in cash and the balance of the account taken care of by note secured by second mortgage as required by the loan company, with a release to insure no material lien against the building. The writer plans to be in Manhattan some time next week at which time we hope to bring about a final settlement and I trust you can arrange this matter with your Mr. Parker so there will be no delay.

"We now have three apartments occupied and hope to have others rented soon even though it is getting late in the year. My plan in making payments to you on the balance of your account is to pay you whatever is left each month from the rent from the building after the operating costs are paid and interest on the loan set aside, which is the best we can do. I am putting all my cards on the table Walter and you can rest assured every dollar of your account will be paid. We will probably not receive full months rent from all of the apartments for November and December as it will no doubt be the first of the year before we can have the building fully occupied, which would mean our payments to you for the first few months would not be as large as later on."

Again, on November 1, 1934, in reply to a letter from Mr. Lambert, evidently requesting a payment of $4,000 on account of the lumber bill, the insured wrote:

"As stated in my letter of some few days ago it will probably be the first of the year before we can have the building fully rented. When fully rented the monthly income will run $600.00. The Manhattan Mutual Life Insurance Company has agreed to permit us to omit any payments on the principal for the first year in order to be in shape to take care of your balance, the interest on the loan will of course have to be paid. Estimating the monthly operating cost at $200.00, which we believe more than safe, plus about $90.00 per month interest charge on loan, or a total of $290.00 a month, leaving a balance of about $300.00 per month based on the apartment being fully rented. Cannot some arrangement be made with you to take care of the balance on your account, after payment of $3,000.00, as I now feel sure that this is all that can be paid, whereby we would

turn over to you each month whatever balance is left from the income from the building after paying the actual operating expense and the interest on the loan?

"This thing has the writer in a mighty tight spot Mr. Lambert and I believe it will probably be necessary for Mrs. King, Mr. Bardwell and the writer, and if necessary your Mr. Parker, meet with you in your office at Leavenworth and work out a satisfactory arrangement.

"The writer will go to Manhattan upon receipt of word from Mrs. King that the building is fully completed and I sincerely trust that some sort of an arrangement along the lines suggested above can be worked out.

"I am indeed sorry that an apparent misunderstanding has developed as to the amount of cash to be paid on the account, however, my understanding was as stated above and upon my return to Manhattan from our visit with you I advised Mr. Bardwell to that effect. I do not want Mr. Bardwell to get the idea that I am trying to put something over on him as I am not and have shot square with him as he has with me and I am shooting square with you Mr. Lambert and am placing all my cards on the table.

"The writer has spent many sleepless nights trying to arrive at some solution of this matter but to no avail and I am trusting and praying a satisfactory solution of the difficulty can be worked out, either in Manhattan or with you at Leavenworth.

"Awaiting your further comments, I beg to remain."

The last letter of the insured, so far as the record shows, was written to Mr. Bardwell on November 24, 1934, 2 days before the insured's death, and is of interest only as indicating the apparent mental condition of the insured on that date. The letter is as follows:

"I am mailing you itemized statement of the Walters Plumbing Company showing total of $249.06 due for labor and materials furnished for the apartment building.

"Mrs. King paid express in the amount of $8.67 on automatic water heaters included in the Walters statement and it appears to me that this express should be deducted when making final settlement with them. I am also enclosing the paid express receipt and trust proper deduction will be made when making settlement."

During the time that the insured's wife was in Manhattan, from the latter part of September to the 23d day of November, the insured lived alone in his home in Monett, taking his meals at a restaurant, where, even when his wife was at home, he had his breakfast each day. During this period, some of his friends and acquaintances noted that he seemed worried and preoccupied; that he did not respond to their greetings with his former cordiality or take part in their conversations to the extent that he formerly had done; that he sat for long periods gazing into space; that he had at times a glassy stare; that on one occasion, when invited to lunch at the home of a neighbor, he appeared without having shaved, ate little or nothing, and had little to say.

His employer testified with reference to the insured: " * * * he was very positive in his figures, until toward the last he kind of fell down, on his figuring. Immediately before his death he got so he couldn't figure jobs like he ought to. We was figuring a job at the time of his death, a job that was to be let either that evening or the next day; and he figured around and fooled around and said it was the hardest job he ever saw to figure. It wasn't a big job. I can't recall the job; we figure five or six hundred jobs a year, but Mr. Pray was figuring with him, and he can tell you. He (the insured) never finished the figures on that job; he couldn't get his figures just right, and I told him to forget it; that we wouldn't figure it. * * * At the office we would go over the mail, this was for one of the clerks, this for another. I would instruct him what to do. For the last two or three weeks of his life he got so he would come in to look at the mail and before we got through he wouldn't listen at all but get up and step right out of my office just now. It was our custom to go over the mail together every day, and he hadn't done that back through the years. For several weeks he had a strange look in his eye. He would come in and bring me something and before I could talk about it he would walk out. He would go off into his room, before I could go into it with him. We have a suite of nine rooms. I would go in to talk to him about something and he was just a little bit irregular all the time, got worse there considerably. This lasted for weeks; at first I didn't notice it much because he was building a building and had lots of worries. He transacted his individual business in my office. I

had no intention of discharging Mr. King; he had worked for me for ten or eleven years straight, and I never talked to him about it."

On November 14, 1934, the insured went to Manhattan to execute the three mortgages upon the apartment building, which have been referred to. His wife, who accompanied him, asked Mr. Bardwell to read the first mortgage to them. The insured did not suggest having it read. His letters, however, clearly indicate that he was entirely familiar with the proposed financing and had absolute confidence in Mr. Bardwell, who was attending to the matter. The insured returned to Monett on November 14th. His wife, together with her 80-year-old father, followed him by automobile on November 23d, arriving in Monett about noon and finding her husband in the café where he took his meals. He kissed her, spoke to her father, and, after asking her at what time she had left Manhattan, said to her father, "She came pretty fast, didn't she Dad?" He then returned to his office. He was not as pleasant and courteous as he had been on other occasions when his wife had returned after being away. She had never been away so long before. On previous occasions, when she had been absent from home, the insured had had the house cleaned before she returned, but on this occasion that had not been attended to. The insured's wife testified with respect to his return home from his work that evening as follows: "I was talking to a neighbor, and she said to him that I had been working ever since I got home. Mr. Henderson said something to him about being lonely and I said that we needn't be lonesome any more, we would be among friends in Manhattan, and he made the remark that he had been worried, and I said that he needn't worry any more, that the building was all completed." That evening the insured and his wife presented to the Bradfords, who had taken care of their dog while Mrs. King was away, a lamp. "Mr. King (the insured) didn't enter into the conversation at all, didn't seem to pay any attention, and just sat there and looked." On the following day (Saturday, November 24th) "he didn't seem to pay any attention that he was home." That evening he mailed a letter which his wife had written to her sister. Sunday morning (November 25th) he went to work, although it was his usual Sunday off, telling his wife "that

there was a letting on Tuesday and he was working on the plans; they were plans for a sewage disposal plant at Monett." He brought the plans home Sunday afternoon and attempted to work on them. His wife asked him if she could help him, and he "put his hand to his head and said, 'I don't know what's the matter with me. Seems there are times when my mind won't function.'" The insured had always been very fond of his dog, and Sunday evening while he was lying on the lounge, and the dog jumped up on him, he gave the dog a violent push. His wife had never seen him do that before to any dog. That evening he just sat around. His wife called his attention to a want ad in the Kansas City paper for a fifteen-family apartment "because he wanted to stay down there (Monett) with his work," and she thought they should sell the apartment if they could; but he did not answer. Sunday night the insured tossed in his sleep and "kind of moaned and groaned." Monday morning (November 26th, the day of his death) he apparently arose as usual. He did not, however, hang up his pajamas, and the inner sole in one of his house shoes was completely reversed and the shoes were not in the shoe rack. He always put away his shoes and hung up his clothes. After his wife's return from Manhattan, he did not telephone her before he left the office, as had been his previous custom, and never put his arm around her and told her he was glad she was home. His wife found out that he was worrying about the apartment house investment and seemed to think it lost. He told her that he did not want to discuss the apartment, when she suggested that he give up his work and move to Manhattan. They had made plans for his abandoning his work and going to Manhattan for years and had had correspondence with regard to building an apartment building there as early as 1925.

Howard Campbell, an acquaintance of the insured, saw him on the street the morning of his death. The insured had always been very friendly and they had met a great many times. The insured walked to work, and Campbell drove. That morning Campbell met the insured a little earlier than usual. Campbell spoke to him, but the insured did not speak to Campbell, although he looked at him. He acted as though he did not recognize him, turned his head, and walked across the street. Campbell asked him to ride, but he paid no attention, and

crossed over to the other sidewalk behind Campbell's car. From the rear view mirror, Campbell saw him cross the street twice in the space of less than a block. The insured did not have the friendly look on his face that he usually had. This happened about two hours before the insured killed himself.

Mr. Pray, who had been a fellow employee of the insured up to September, 1934, was with the insured Saturday afternoon, November 24th, at Pray's home. Both of them were figuring a construction job to be let on the following Tuesday. They checked figures from shortly after 1 to 5 o'clock. Then the insured went to his office, and Pray followed him down. They then drove to the insured's house to tell his wife that the insured would be late in coming home. They went back to Pray's house and completed their check of computations. When the insured first sat down to the table where he and Pray were comparing figures, the insured said to Pray: "This job has kind of got me stumped. It is the hardest job I have ever figured. I have had so much worry over that apartment building and other things that I just can't seem to get going on it." The insured and Mr. Pray compared their figures, which checked. There was nothing unusual or unnatural that Mr. Pray observed in any of the conversation which he had with the insured. It was unusual for the insured to be worried over figuring a construction job, since he had had more experience than Mr. Pray. There was no incoherent, rambling, or unintelligent conversation. On Sunday Mr. Pray saw the insured at his office, and invited him to visit Pray's farm to see some shorthorn calves. The insured said, "I don't know what the folks will want to do this afternoon, but if I don't come by two o'clock you will know I am not going." He did not come, and Mr. Pray did not see him again. Mr. Pray said the insured seemed sane, but worried.

On Monday morning, November 26th, the insured went to the post office for the mail, and apparently distributed it in Mr. Gillioz' office, as was his custom. He was found, shortly thereafter, with his overcoat still on and his hat lying beside him, in the vault in the office. The door of the vault was open. He had shot himself through the head, and the pistol was still in his hand. He was breathing, but unconscious, when found. What pistol he used, how, when, or where he obtained it or the ammunition for it, the evidence does not disclose.

In addition to the policy in suit, the insured, at the time of his death, had two other $5,000 life policies and one $4,000 accident policy.

At the trial the plaintiff produced a Dr. Romeiser as a medical expert. He did not know the insured and had never treated him, but, in answer to a hypothetical question, he testified that the insured was insane prior to and at the time he shot himself; that he had "a type of insanity characterized by extreme morbid depression and being dominated by an irresistible or uncontrollable impulse to do away with himself"; and that "This type of insanity technically is classed with the depressive psychosis, or, more inclusive, the manic depressive type of psychosis, which means, in this instance, that the melancholic depression was the outstanding feature of the case, as evidenced by his changed habits, depression, behavior and incapacity for his duties in the office, as stated in the hypothetical question."

It is to be noted that there is not in the record any evidence that at any time prior to his death the insured suffered from any delusions or hallucinations or that he wrote or talked otherwise than intelligently and sanely. Neither is there any evidence that his judgment, his will, or his memory had become impaired. There is, evidence that he was worried, irritable, depressed, preoccupied, and discouraged. No witness who testified for the plaintiff, with the exception of her medical expert, stated that the insured at any time appeared to be insane. As to the admissibility of the opinions of nonprofessional witnesses as to insanity, see Connecticut Mutual Life Ins. Co. v. Lathrop, 111 U.S. 612, 4 S.Ct. 533, 28 L.Ed. 536. One witness made the statement that in his judgment the insured "was a man going insane"; but this testimony was stricken from the record.

Counsel for the beneficiary points to the insured's belief that his investment in the apartment building had been lost as a delusion. There is no evidence in the record which would enable any one to determine the value of the equity of the insured in this building. The fact that it had cost more than $50,000 and was mortgaged for $18,000 was no proof that its market value was in excess of the encumbrances, or that the situation with which the insured was confronted was such that no sane man

would have worried about it. It must be remembered that this all occurred in the year 1934, a period of great uncertainty as to values. It is a matter of common knowledge that in many places at that time real estate had little or no market value. It cannot be said that the insured's belief that he had lost the money invested amounted to a delusion, or even indicated an impairment of his judgment. The insured had placed all his eggs in one basket, in which he apparently had lost his confidence.

That the changes in the insured's habits and the deviations from his normal course of life, shown by the evidence, are consistent with the hypothesis that he was a sane but worried man, cannot be doubted.

■ The evidence, taking that view of it which is most favorable to the plaintiff, shows nothing more than a possibility that the insured may have been insane when he shot himself. It does not show that he was insane at that time. The issue was left by the evidence in the realm of speculation and conjecture. The case falls within the well-settled rule that evidence which is equally consistent with two hypotheses, under one of which a defendant is liable, and under the other of which it is not liable, supports neither hypothesis. Gunning v. Cooley, 281 U.S. 90, 94, 50 S.Ct. 231, 233, 74 L.Ed. 720; Stevens v. White City, 285 U.S. 195, 204, 52 S.Ct. 347, 350, 76 L.Ed. 699; Svenson v. Mutual Life Ins. Co. of New York, 8 Cir., 87 F.2d 441, 443.

■ It is, of course, well settled that the mere fact of suicide, standing alone, is not substantial evidence of insanity. "There is no reason why the mere fact of suicide should remove the presumption of sanity which obtains in all cases where human conduct is under investigation. It is true, suicide may be taken in connection with other evidence with which it is consistent, to show insanity, but, standing alone, it cannot support the issue." Supreme Council of Royal Arcanum v. Wishart, 3 Cir., 192 F. 453, 457.

In Charter Oak Life Insurance Company v. Rodel, 95 U.S. 232, 240, 241, 24 L. Ed. 433, the Supreme Court approved a charge in which the trial court had instructed the jury as follows: "On the other hand, there is no presumption of law, prima facie or otherwise, that self-destruction arises from insanity."

In Ritter v. Mutual Life Insurance Co., 169 U.S. 139, 147, 148, 18 S.Ct. 300, 302,

42 L.Ed. 693, a charge containing the following language was approved: "The only question, therefore, is whether or not he was in a sane condition of mind, or whether his mind was so impaired that he could not, as I have described, properly comprehend and understand the character and consequences of the act he was about to commit. In the absence of evidence on the subject, he must be presumed to have been sane. The presumption of sanity is not overthrown by the act of committing suicide. Suicide may be used as evidence of insanity, but, standing alone, it is not sufficient to establish it. * * * If you find him to have been insane, as I have described, your verdict will be for the plaintiff. Otherwise it will be for the defendant."

■ There is nothing in the testimony in this case, other than the fact of suicide itself, upon which to base an opinion that the insured killed himself as the result of insane impulse. The testimony of Dr. Romeiser, under the circumstances, is not substantial evidence. United States v. Hill, 8 Cir., 62 F.2d 1022, 1025, 1026; Svenson v. Mutual Life Ins. Co. of New York, 8 Cir., 87 F.2d 441, 445.

In Connecticut Mutual Life Ins. Co. v. Lathrop, 111 U.S. 612, 619, 4 S.Ct. 533, 536, 28 L.Ed. 536, Mr. Justice Harlan, in discussing the question whether witnesses who are not experts in medical science might express their judgment as to the sane or insane state of a person's mind, said: "Whether an individual is insane, is not always best solved by abstruse metaphysical speculations, expressed in the technical language of medical science."

We think that common sense and sound judgment must reject the theory that such proof of discouragement, preoccupation, and worry as is contained in the record in this case is a sufficiently substantial basis for an expert opinion that a person otherwise mentally normal is insane.

■ It is only when the reasoning faculties of an insured who commits suicide are so far impaired that he is not able to understand the moral character, the general nature, consequences, and effect of the act he is about to commit, or when he is impelled thereto by an insane impulse, that he may be found to be insane. Mutual Life Insurance Co. v. Terry, 15 Wall. 580, 21 L.Ed. 236; Charter Oak Life Insurance Company v. Rodel, 95 U.S. 232, 24 L.Ed. 433; Manhattan Life Insurance Co. v. Broughton, 109 U.S. 121, 3 S.Ct. 99, 27 L.

Ed. 878; Accident Insurance Co. v. Crandal, 120 U.S. 527, 531, 7 S.Ct. 685, 30 L.Ed. 740; Ritter v. Mutual Life Insurance Co. of New York, 169 U.S. 139, 18 S.Ct. 300, 42 L.Ed. 693.

Our conclusion is that the court should have directed a verdict for the defendant. In view of that conclusion, it is not necessary to discuss the other alleged errors, since they are unlikely to occur upon a new trial.

The judgment appealed from is reversed, with directions for further proceedings not inconsistent with this opinion.