### RELIANCE LIFE INS. CO. v. BURGESS et al.

### No. 11657.

Circuit Court of Appeals, Eighth Circuit.

May 29, 1940.

Rehearing Denied Aug. 5, 1940.

See, also, 30 F.Supp. 264.

James C. Jones, Jr., and Web A. Welker, both of St. Louis, Mo. (Howard F. Major, of Columbia, Mo., James C. Jones, of St. Louis, Mo., Stockard & Stockard, of Jefferson City, Mo., and Jones, Hocker, Gladney & Grand, of St. Louis, Mo., on the brief), for appellant.

William H. Becker, of Columbia, Mo. (Nick T. Cave, Ruby M. Hulen, Boyle G. Clark, James E. Boggs, Paul M. Peterson, and Howard B. Lang, Jr., all of Columbia, Mo.; on the brief), for appellees.

Before GARDNER, SANBORN, and WOODROUGH, Circuit Judges.

GARDNER, Circuit Judge.

This was a proceeding brought by the appellant as plaintiff against the appellees as defendants, under the Federal Declaratory Judgment Act, Jud.Code § 274d, 28 U.S.C.A. § 400, for a determination of the rights of appellees and the obligation of appellant under the accidental death benefit of six policies of life insurance and one policy of accident insurance issued by appellant to Thomas A. Burgess, the appellees' intestate. The parties will be referred to as they were designated below.

Thomas A. Burgess, the insured under each of the policies, died on the 7th of November, 1938, as the result of a gunshot wound, which the plaintiff alleged was intentional or suicidal, but which the defendants claim was accidental. Plaintiff conceded liability for the strictly life insurance benefits of the six policies of life insurance, but denied liability under the policies for benefits for accidental death. These policies were all applied for and delivered in Missouri and were in full force and effect at the time of the insured's death. The life insurance benefits of the policies amounted in the aggregate to $10,000, and each of the life insurance policies contained a double indemnity provision under which the company agreed to pay double the face of the policies in the event insured's death "resulted directly and independently of all other causes from bodily injuries effected solely through external, violent and accidental means." The aggregate amount payable under the double indemnity benefit of the life policies and the accident policy was $11,000. The policies were all payable to the insured's estate and the defendants are the administrators of that estate. Plaintiff in its petition conceded its liability under the life insurance benefits of the policies, and subsequent to the institution of this proceeding, it served and filed an offer to allow judgment to be taken against it for that amount.

A Missouri statute (§ 5740, R.S.Mo.1929, Mo.St.Ann. § 5740, p. 4385) provides that suicide shall not be a defense to an action on a policy of insurance unless in contemplation by the insured at the time the policy issued.

The insured was a man of about forty-five years of age at the time of his death, and for several years had been engaged in the wholesale liquor business at Columbia, Missouri. He lived with his wife, Mae B. Burgess, and his father, Ervin C. Burgess. His death occurred in his home sometime between 11 and 11:30 p. m. At the time he was carrying a shotgun which he had procured from the attic on the third floor of the home. There were no eye witnesses to the discharge of the gun.

The action was tried to a jury. At the opening of the trial, the question as to whether the plaintiff or the defendants had the burden of proof was raised, and the trial court held that the burden of

proof was upon plaintiff. The plaintiff excepted to this ruling but proceeded to the introduction of evidence in support of its petition. It offered the policies in controversy and a certified copy of the official death certificate of the insured, which gave the cause of death as suicide from a self-inflicted gunshot wound, and then rested.

Defendants then proceeded with the introduction of evidence, at the close of which the plaintiff moved for a directed verdict, which was denied by the court. The court then submitted the case to the jury, both on the question of an accidental or suicidal death, and on the question of whether the insured was sane or insane at the time of his death, and charged the jury, over objection of the plaintiff, that the burden of proof was on plaintiff to show that the insured's death was suicidal and also that he was sane at the time of his death. The court submitted special interrogatories as follows: (1) "Did Mr. Burgess come to his death as the result of an accidental, unintentional discharge of the shotgun?" (2) "If your answer to the first question is 'No'—was his death the result of his intentional act?" (3) "If your answer to the second question is 'Yes' —was he sane at the time?" (4) "If your answer to the third question is 'No'—was he insane at the time?"

After the jury had had the case under consideration for some time, the foreman of the jury sent the following written communication to the court: "We believe it will be impossible for this jury to reach a verdict under the instructions. We are unanimously of the opinion that Thomas A. Burgess had suicidal intentions, but are equally divided as to whether he came to his death by suicide or accidental means."

Upon receipt of this communication, the court called the jury into the courtroom and directed them to continue in their efforts to arrive at a verdict. Later the foreman of the jury sent a further written communication to the court as follows: "Our unanimous agreement is that, whether accident or suicide, Mr. Burgess was at the time of accident or suicide, not in his normal mental condition, but we are equally divided as to whether death was accidental or self-inflicted."

The court again called the jury into the courtroom and gave them the following interrogatory to answer: "Was Thomas A. Burgess insane, as that term has been defined, at the time of the discharge of the gun?"

The court then re-read to the jury the portion of his previous charge on insanity and directed them to retire for further deliberation. Subsequently the jury transmitted to the court an affirmative answer to the last named interrogatory, and the jury was again brought into the courtroom and the court read to them the substance of his previous charge on the issue of insanity and directed them to retire and endeavor to arrive at a general verdict. The jury later returned a general verdict, finding the issues in favor of defendants. From the judgment entered thereon this appeal is prosecuted.

Plaintiff seeks reversal on substantially the following grounds: (1) the court erred in holding that the burden of proof was upon it; (2) the court erred in its instructions to the jury; (3) the court erred in overruling its motion for a directed verdict; (4) the court erred in denying plaintiff the right, on cross-examination of the coroner, to show the statements made to the coroner by the insured's father while the coroner was making an official investigation of the circumstances of insured's death; (5) the court erred in permitting evidence of insured's statement that he had taken nine grains of nembutal during the evening preceding his death; (6) the court erred in not requiring defendants to elect, at the close of all the testimony, whether they would go to the jury on the theory of an accidental discharge of the shotgun or on the theory of insane suicide.

The question as to who must sustain the burden of proof in a declaratory judgment suit is a comparatively new one, which we think does not admit of a categorical answer. It must depend, as in other classes of litigation, upon the condition of the pleadings and the character of the issues at the time the question is presented. Plaintiff alleged that the insured committed suicide while sane. It alleged an actual controversy, and the proceeding was instituted by it to determine that controversy. Defendants denied that a justiciable controversy existed and put in issue the allegations of plaintiff's petition, but they asked no affirmative relief but prayed only to be discharged with their costs. The question as to whether the burden of proof in its primary sense rests upon the plaintiff or defendant is ordinari-

ly to be determined by ascertaining from the pleadings which of the parties without evidence would be compelled to submit to an adverse judgment before the introduction of any evidence. It is a fundamental rule that the burden of proof in its primary sense rests upon the party who, as determined by the pleadings, asserts the affirmative of an issue and it remains there until the termination of the action. It is generally upon the party who will be defeated if no evidence relating to the issue is given on either side. Lilienthal v. United States, 97 U.S. 237, 24 L.Ed. 901; Omaha Hotel Co. v. Wade, 97 U.S. 13, 24 L.Ed. 917; Davis v. O'Hara, 266 U.S. 314, 45 S.Ct. 104, 69 L.Ed. 303.

Plaintiff contends that in bringing its suit, it did not change the essential nature of the case and that defendants in reality were asserting a cause. of action on each policy against it, and hence they must bear the burden of proof. When the questioned ruling was made, the court had before it only the pleadings. As before noted, defendants did not in their answer assert any cause of action, nor did they seek any affirmative relief. The court could not, therefore, have anticipated that they would do so, and hence the ruling when made was correct. Whether the acts of defendants during the course of the trial may have shifted the burden of going forward with the evidence remains to be considered.

The Declaratory Judgment Act, 28 U.S.C.A. § 400, "did not create any new substantive right. It is procedural in nature, designed to expedite and simplify the ascertainment of uncertain rights; and it should be liberally construed to attain that objective." Ohio Casualty Co. v. Marr, 10 Cir., 98 F.2d 973, 975. · During the course of the trial, defendants offered evidence in support of their right to recover on the policies. When they thus became the actors, the burden of proof in its secondary sense—the obligation of going forward with the evidence—shifted to them, and they were obliged to meet with evidence the prima facie case created against them. In this sense, the burden shifted from time to time as the trial progressed and the evidence was introduced by the respective parties. In our view as to other issues involved, we do not deem it essential to pursue this question further.

The court instructed the jury that, "Because of the value ordinarily placed upon our own lives by human beings, there is a presumption in the case of unexplained death that a person did not take his own life. This presumption is not conclusive and will not control your verdict if you conclude otherwise from the evidentiary facts."

This instruction was excepted to by the plaintiff on the ground that the presumption against suicide had been refuted by the evidence and that it was therefore improper to charge the jury with respect thereto. There was substantial evidence before the jury warranting a finding of suicide. This being true, the presumption fell out of the case. Such a presumption can never be given weight as evidence. Del Vecchio v. Bowers, 296 U.S. 280, 56 S.Ct. 190, 80 L.Ed. 229; New York Life Ins. Co. v. Gamer, 303 U.S. 161, 58 S.Ct. 500, 82 L.Ed. 726, 114 A.L.R. 1218; Griffith v. Continental Casualty Co., 290 Mo. 455, 235 S.W. 83, Id., 299 Mo. 426, 253 S.W. 1043; Ryan v. Metropolitan Life Ins. Co., 206 Minn. 562, 289 N.W. 557. As said by the Supreme Court in Del Vecchio v. Bowers, supra [296 U.S. 280, 56 S.Ct. 193, 80 L.Ed. 229], "Once the employer has carried his burden by offering testimony sufficient to justify a finding of suicide, the presumption falls out of the case. It never had and cannot acquire the attribute of evidence in the claimant's favor."

In New York Life Insurance Co. v. Gamer, supra, the question was again before the Supreme Court, and in the course of the opinion it is said [303 U.S. 161, 58 S.Ct. 503, 82 L.Ed. 726, 114 A.L.R. 1218]: "The evidence being sufficient to sustain a finding that the death was not due to accident, there was no foundation of fact for the application of the presumption; and the case stood for decision by the jury upon the evidence unaffected by the rule that from the fact of violent death, there being nothing to show the contrary, accidental death will be presumed. The presumption is not evidence and may not be given weight as evidence."

In Griffith v. Continental Casualty Co., supra, the Supreme Court of Missouri said [290 Mo. 455, 235 S.W. 85]: "With the facts all before the jury, the presumption against suicide had no further procedural purpose to serve."

The instruction was erroneous and, we think, prejudicial.

It seems fairly clear that the jury found that the insured committed

suicide while insane. Plaintiff contends that the evidence is insufficient to show insanity. There was a presumption in favor of sanity. Scales v. National Life & Accident Ins. Co., Mo.Sup., 212 S.W. 8; New York Life Ins. Co. v. King, 8 Cir., 93 F.2d 347. Defendants, on the theory that the burden of producing evidence on that issue had shifted to them, produced evidence which they rely upon, which is substantially as follows:

The insured took nine one and one-half grain tablets of nembutal the night before his death. The only evidence of this is a statement which the insured made to Mr. Gum, his employee. This was clearly hearsay and its reception was prejudicial error. Landau v. Travelers' Ins. Co., 305 Mo. 563, 267 S.W. 376; Aetna Life Ins. Co. v. Quinley, 8 Cir., 87 F.2d 732; London Guarantee & Accident Co. v. Woelfle, 8 Cir., 83 F.2d 325. But if the evidence be considered, it was not sufficient to prove that the insured at the time of his death was so mentally unbalanced as not to appreciate the effect of his own act, nor to make that a jury question. In fact, a medical witness for the defendant testified that nine one and one-half grains of the drug are frequently given to produce an anesthesia or stupor in a woman in childbirth. There is no evidence as to the time on the preceding night at which the insured may have taken this drug. Under the evidence, twenty-four hours may well have elapsed before he killed himself. The doctor testified that such a dose of this medicine reached its maximum effect in six hours, and then the wearing off process begins; that the after-effects of such a dose would be substantially the same as a "hang-over" from the consumption of intoxicating liquor; that there is a loss of memory while the drug is active, but the memory returns when the effect of the drug begins to wear off; that after-effects, such as dizziness, headaches, and incoherency, vary with different individuals. Gum testified that insured appeared at his place of business on the morning of the day of his death, about three hours later than usual, in an unshaven and unkempt condition; that when he came in he staggered and almost fell before he reached his office; that he stayed in the office and slept; that he talked incoherently at times during the day. Gum aroused the insured about 5:30 in the afternoon, following which insured complained at times of his head hurting him badly. However, he ate dinner with Gum, and Mrs. Burgess testified that when he came home about 10 or 10:30 p. m., he asked about bus schedules to Kansas City. He went upstairs to bed soon after coming home, and she followed thirty or forty minutes later. In his bedroom before retiring, he complained that his head hurt. Later he came into her bedroom and again said his head hurt. She suggested calling a doctor but he said he did not want one, and she thought he had been drinking until she smelled his breath. There is some evidence that he quarreled with his wife. He ran out of the room up to the attic on the third floor and came down carrying a shotgun by the barrel. She called his father, who was sleeping across the hall, who attempted to quiet him, but the insured said, "You keep out of this, dad. You don't want in this," and "Father, don't bother me. I might hurt you." There was some scuffling to recover the gun, which fell down on the smooth floor, but the insured retrieved it, saying that he would take the gun downstairs. He started downstairs carrying the gun in his left hand upright by the end of the barrel. Because of the landing in the stairway, it was impossible to see insured as he passed this landing, but as his footsteps resounded on the steps below the landing, the gun was discharged and the body and the gun were heard to strike the floor. The father testified that his son's eyes didn't look right; that he looked a little like a person under the influence of narcotics; he had an excited look.

There was neither expert medical opinion, nor indeed lay evidence to the effect that the conduct or actions of the insured indicated insanity; in fact, no witness, lay nor expert, gave it as his opinion that the insured was insane at or prior to the time he shot himself. As said by this court in New York Life Insurance Co. v. King, supra [93 F.2d 353], "It is only when the reasoning faculties of an insured who commits suicide are so far impaired that he is not able to understand the moral character, the general nature, consequences, and effect of the act he is about to commit, or when he is impelled thereto by an insane impulse, that he may be found to be insane."

The evidence on the issue of insanity was not substantial, and to conclude that the insured was insane rests wholly on speculation and conjecture. We think there was no substantial evidence to sustain a finding of insanity.

■ It appears that the gun with which insured was killed was "taken down" and kept in the attic. The insured went to the attic, put the gun together, found two shells, and loaded the gun. He then carried it downstairs into his bedroom; had an altercation about it with his wife and father, and then rushed downstairs and either deliberately or accidentally shot himself. When the gun was found after the insured's death, the right hammer was cocked; the left hammer was down, and the shell in the left barrel had been discharged. There was blood in both barrels of the gun. Defendants, not relying upon any presumption of accident arising from proof of death by a violent and external means, attempted to prove by an expert how insured might accidentally have shot himself, but under this expert's explanation, the blood could not possibly have run into the barrels of the gun. The presence of blood in the barrels is uncontradicted proof of a physical fact wholly inconsistent with an accidental discharge of the gun. Burkett v. New York Life Insurance Co., 5 Cir., 56 F.2d 105.

There being no substantial evidence of insanity and no substantial evidence of an accidental discharge of the gun, the insured's death was suicidal and not accidental, and hence the court erred in denying plaintiff's motion for a directed verdict.

■ There was a motion to dismiss the appeal on the ground that notice of appeal was not given within ninety days from the entry of final judgment. Judgment was entered July 27, 1939. On August 5, 1939, plaintiff served on the defendants a motion for judgment notwithstanding the verdict or for a new trial in accordance with Rule 50(b), Rules of Civil Procedure for District Courts, 28 U.S.C.A. following section 723c. The motion papers were actually filed on August 7, 1939. On September 2, 1939, the court overruled the motion, and on November 24, 1939, notice of appeal was given. It is contended that the judgment became final because the motion for a new trial was not filed within ten days from the entry of judgment. We think the rules do not require the aggrieved party to take an appeal within ninety days from the date of judgment where a timely motion for judgment notwithstanding the verdict or a new trial has been served within ten days of the date when the judgment was entered.

The motion to dismiss the appeal is therefore denied.

■ Plaintiff made a motion for judgment notwithstanding the verdict, which was denied. It follows that the judgment appealed from should be reversed and the cause remanded with directions to enter judgment for the plaintiff. Rule 50, Rules of Civil Procedure; Massachusetts Protective Assn. v. Mouber, 8 Cir., 110 F.2d 203; Lowden v. Denton, 8 Cir., 110 F.2d 274. It is so ordered.

SANBORN, Circuit Judge (concurring).

I concur, but my opinion as to the burden of proof is, I think, not exactly that expressed by Judge GARDNER. I agree that it is not necessary, in deciding this case, to attempt to establish a rule as to the burden of proof applicable to all cases arising under the Declaratory Judgment Act. I agree, also, that the court below was justified in requiring the plaintiff to proceed with its evidence at least up to the time that it became apparent that an actual controversy between the parties existed and that the defendants were claiming the right to recover under the policies in suit. The plaintiff in its complaint asserted the existence of a justiciable controversy between the parties. This the answer denied. If such a controversy did not exist, the case was for dismissal for want of jurisdiction. If such a controversy did exist, it was the subject matter of the suit and was properly before the court for adjudication. As soon as the existence and the nature of the controversy were established, it was then apparent that the right of the defendants to recover under the policies depended upon their establishing, by a fair preponderance of the evidence, that the insured came to his death as the result of an accident. From that time forward, the burden of proving that the insured's death was accidental was as much upon the defendants as it would have been had they initiated the suit themselves. See and compare Travelers Insurance Co. v. Greenough, 88 N.H. 391, 190 A. 129, 109 A.L.R. 1096. See, also, 16 Am.Jur. page 337, § 69.

My opinion is that the burden of proving the existence of the controversy was on the plaintiff, but that the burden of proving the fact upon which the defendants relied for the establishment of their

right of recovery was upon them. I think it would be safe to say that when an actual controversy is presented to a court for adjudication through the medium of a suit for a declaratory judgment, the burden of proving, by a fair preponderance of the evidence, the existence of the fact or facts upon which the rights and liabilities of the parties depend is upon him who has the affirmative of the issue which forms the basis of the controversy, without regard to whether he is plaintiff or defendant in the suit. In this case, the question of the burden of proof is perhaps not controlling, but it may be vital in some similar case, and it is of consequence, I think, that the party who actually has the burden should be accorded the advantages upon the trial which usually go to one in his situation.

It is apparent that we are all agreed that the actual controversy presented by a declaratory judgment suit is to be determined upon its merits according to the evidence and the applicable rules of law, and that no rights are to be declared which have not the necessary factual basis to support them. It seems to me that when the nature of a controversy which forms the subject matter of such a suit and the relations of the parties to that controversy are fully disclosed, the trial court will ordinarily have little difficulty in determining upon which of the parties the burden of proof rests.