Saul S. Street, J.
This is an action by Felix Juan Serralles against Mercedes Mundo Viader, hereinafter referred to as the defendant, Ann Mundo, also known as Ann Serralles, the infant daughter of the defendant, hereinafter referred to as the infant, and the Department of Health of the City of New York, for a judgment declaring that he, Serralles, is not the father of the infant, and for a decree directing the Department of Health to correct the infant’s birth certificate by eliminating the name of the plaintiff as the father.
The complaint alleges that the infant was born to the defendant at St. Francis Hospital in the borough of The Bronx in the city of New York on December 16, 1952; that at the time of the birth of the said infant the defendant caused plaintiff’s name to be entered in the certificate of birth of the said infant, which certificate is now on file in the Bureau of Records and Statistics of the Department of Health of the City of New York, as the father thereof, and caused the name of the said infant to be stated as Ann Serralles, without his knowledge or consent; that the defendant wrongfully contended and now contends that he is the father of said infant and responsible for its support; that under the laws of the Commonwealth of Puerto Rico an illegitimate child of a testator who dies domiciled therein is a “ forced heir ” and has a right to share in the estate of the putative *685 father; that the defendant’s claim that he is the father is causing him great humiliation and injury to his reputation; and that the relief requested is essential to the protection of his rights and interests and those of his wife and children.
The defendant in her answer admits that she caused the plaintiff’s name to be entered as the father of the said infant in the certificate of birth, and by way of counterclaim asserts that the plaintiff is the father of the said infant and asks for an affirmative declaration by this court that the plaintiff is the father of the aforesaid infant, born to the defendant.
The infant appears in this action by her duly appointed guardian ad litem, and alleges that the defendant is her mother and that the plaintiff is her father. By way of counterclaim she asserts her rights as a “ forced heir ” under the laws of the Commonwealth of Puerto Rico, and asks for a declaratory judgment that plaintiff is her natural father. In addition, the infant asks this court to fix a sum for her support, to be paid by the plaintiff, as well as an allowance to the guardian ad litem for his services rendered in her behalf.
The Department of Health appeared and its answer denied upon information and belief the allegations of the complaint. As a defense it set forth the pertinent provisions of section 567-2.0 of the Administrative Code of the City of New York and section 254 of the Judiciary Law, which sections provide for the correction of birth certificates when proof is submitted of a judgment, order or decree of a court of competent jurisdiction relating to the parentage of any person.
In essence, this is a proceeding to determine the status of an infant; more particularly, the paternity of an illegitimate child. The ultimate result in this case can be arrived at only by resolving sharply disputed issues of fact. Before discussing the testimony, however, I shall dispose of certain questions of jurisdiction and burden of proof posed in what appears to be a case of first impression.
With respect to the question of jurisdiction, when this action was commenced the defendant, appearing specially, moved to dismiss the complaint, pursuant to rule 107 of the Rules of Civil Practice, on the grounds that the court did not have jurisdiction of the subject matter of the action and that there was another action pending in Puerto Rico between the parties. This motion came on to be heard before Mr. Justice Eder, in Special Term, Part III, and that learned Justice denied the motion. (See Serralles v. Viador, N. Y. L. J., Nov. 19, 1954, p. 8, cols. 1-2, affd. without opinion, 285 App. Div. 947.)
*686 In overruling the challenge made to this court’s jurisdiction on the ground that the parties were neither residents of nor domiciled in this State, Mr. Justice Eder held that “ The cause of action, however, did presumptively arise in this state, the birth having taken place in this city and the birth certificate accordingly issued by the department of health of this city. * * * That this action is properly brought for the declaration of the relationship of non-parentage, and thus within the orbit of section 473, Civil Practice Act, as one £to declare rights and other legal relations’, is clear. ”
Thereafter and in December, 1954, the defendant Department of Health moved to dismiss the complaint herein pursuant to rule 106 of the Rules of Civil Practice, on the ground that the complaint did not state facts sufficient to constitute a cause of action. This motion came on to be heard before Mr. Justice Benvestga, who denied the motion, holding that the plaintiff’s ££ action is a proper one for declaration ” of nonpaternity and correction of the birth certificate, and that the Department of Health was a proper party (Serralles v. Viader, N. Y. L. J., Dec. 14, 1954, p. 6, col. 1). It would appear that these decisions have established the law of the case as to the sufficiency of the complaint (Henry v. New York Post, 168 Misc. 247, affd. 255 App. Div. 973, affd. 280 N. Y. 842; Walker v. Gerli, 257 App. Div. 249; De Seversky v. P. & S. Pub., Inc., 36 N. Y. S. 2d 271).
At the trial of this action and before any testimony was adduced, the guardian ad litem moved to dismiss the complaint on the ground that this court lacked jurisdiction and was not the proper forum to entertain this action. Regardless of what interpretation may be given to these Special Term decisions as to the jurisdiction of this court to determine the status and paternity of an infant, treating the question res nova, I hold unequivocally that the Supreme Court has plenary jurisdiction to determine the status of illegitimate infants, and that an alleged putative father may bring an action for a declaratory judgment that he is not the father (Matter of Lentz, 247 App. Div. 31; Matter of Melis v. Department of Health, 260 App. Div. 772; Commissioner of Public Welfare v. Koehler, 284 N. Y. 260; Borchard on Declaratory Judgments [2d ed.], pp. 293-314). Nor is there any doubt concerning the validity of the infant’s or mother’s counterclaim for a declaration of paternity (Morecroft v. Taylor, 225 App. Div. 562; Scalone v. Scalone, 199 Misc. 210).
As to the question of burden of proof, the plaintiff asks for a declaration that he is not the father. The defendant and the *687 infant counterclaim for an affirmative declaration that he is the father. While a declaration in either form may or may not have the same effect on the parties, the nature of the proof required is not identical. The essentials necessary for the plaintiff to establish a prima facie case are that he and the defendant were not married and that he did not have any sexual relations with her at or within the time of conception. In order to establish their counterclaims, the defendant and infant are required to prove by at least a fair preponderance of the evidence that the defendant and the plaintiff actually had relations at a specific place or places within the required time that resulted in the birth of the infant (Commissioner of Public Welfare v. Ryan, 238 App. Div. 607; Wigmore on Evidence [2d ed.], § 2498).
formally the burden of proof as to the complaint is on the plaintiff, whereas the burden as to a counterclaim is on the defendant. There are some authorities which hold that in a suit for a declaration of nonliability the burden may shift to the defendant (Borchard on Declaratory Judgments [2d ed.], p. 404; Travelers Ins. Co. v. Greenough, 88 N. H. 391; 62 Harv. L. Rev. 787-885; cf. Reliance Life Ins. Co. v. Burgess, 112 F. 2d 234).
In the case of Hertzberg v. Hertzberg (46 N. Y. S. 2d 453, 455) wherein the plaintiff sought a declaratory judgment that he was not the husband of the defendant, the court held that “ The burden of proof in the present case is upon the plaintiff to establish the ultimate fact that no valid marriage existed between him and the defendant. ”
Whether a negatively defensive action for a declaratory judgment shifts the burden, with all of its concomitant advantages, is not necessary to decide here. The parties have adopted and followed the procedure of permitting the plaintiff to testify to the bare essentials of his prima facie case as outlined above, without anticipating any of the evidence to be adduced by the defense, after which the defendants came forward with their testimony both as to their defenses and counterclaims, the defendant and infant agreeing that they had the burden of establishing their counterclaims.
From herein the case simmers down to a factual determination as to whether there was coition between the plaintiff and the defendant during the weekend of February 15 or during March or April, 1952, which culminated in the birth of the infant on December 16, 1952.
Before making any findings or drawing any conclusions, I shall first cull from this voluminous record a summary of the testimony of the essential witnesses.
*688 Plaintiff, a native of Puerto Rico, testified that he was married and the father of four children. He said that he was an executive in the family’s firm which owns and operates a sugar refinery and celebrated distillery, the president of the board of directors of the Bank of Ponce, and active in the civic affairs of the island. He testified that he first met the defendant at the Happy Landing Restaurant at the Isla Grande Airport at San Juan, Puerto Rico, in November or early December of 1951. He said he once saw her at a restaurant known as Marin’s Bar, at another time at the employees’ club of the Banco Popular, where she was employed, and again on February 22, when she was on his boat, an Elco 35. This last occasion was at the invitation of Luis Muniz, who came with her and another couple. He said they fished for about an hour and then returned to the boat dock, when the two couples left and he, the plaintiff, returned to Ponce. He testified that he never saw her socially after that nor did he see her again until August 12, 1952, when she came to his office. He testified that he never had any sexual relations with her, never knew his name was on the birth certificate until his attorney notified him in 1954, and denied that he is the father of the infant.
The defendant, age 22, testified that she was unmarried when she met the plaintiff on January 12, 1952, at the El Patio Restaurant at San Juan. From there she went with him to a party at the home of Dr. Sanchez-Castano, then to some house owned by the plaintiff at a place called Aibonito, following which he drove her home to Santurce. After that she said he saw her and phoned her frequently. She testified that at about 5:30 p.m on February 15,1952, pursuant to a prior appointment, the plaintiff met her at her friend Ida Otero’s house at Santurce and then drove to the airport at San Juan, where a man named Victor Honoré joined them. From there all four flew to Ponce in the plaintiff’s plane and spent most of the weekend together on his boat, where they had sexual relations on the nights of February 15 and February 16; after that she said she saw him every Tuesday and Thursday or Friday at about 5:30 p.m. On each of these occasions he took her to a room on the eighth floor of the Caribe Hilton Hotel at San Juan, where they had dinner, followed by sex relations. This went on until the first week in April, when she said he abruptly ended the relationship and refused to take her telephone calls.
She testified further that she had her last menstrual period on March 9, 1952 and that the plaintiff was the only man with whom she ever had any sex relations up until that time.
*689 She said that on August 12, 1952, accompanied by her father, she went to the plaintiff’s office in Ponce, where she told him she was going to have a baby and asked him to help her find a solution. It was then that she said she learned for the first time that he was a married man. He recommended an abortion but she would not consider it. An appointment was then made for August 19, 1952. On that day at the home of Dr. SanchezCastano, in Carolina, Puerto Rico, she, together with her father and her two uncles, met with the plaintiff and his lawyers, Leopoldo Tonnes and Orlando Antonsanti. Also present was a lawyer named Benicio Sanchez-Castano, a brother of Dr Sanchez-Castano.
After several hours of discussion, she said it was decided that the plaintiff was to give her enough money to last her for two or three years, that she would have the baby in New York, and that she would sign a paper exonerating the plaintiff from any responsibility for her pregnancy. Then Mr. Benicio SanchezCastano, on behalf of the plaintiff, gave her father $10,000 in cash, she signed a letter, known here as Plaintiff’s Exhibit 6, exculpating plaintiff, and some days later left for New York with her father.
On December 16,1952 she gave birth to the infant at St. Francis Hospital in The Bronx, New York City. On May 7,1953, she married Narcisso Viader.
The plaintiff has produced Reverend Toribio Marijuan, a Catholic priest from Santurce, who testified that he has known the plaintiff and his family since 1932. He said that on February 14, 1952, one Julita Serralles Wirshing, an aunt of the plaintiff, died; that he, Father Marijuan, drove to the deceased’s home in Ponce, 90 miles from San Juan, arrived there at about 3:30 p.m. and remained until 9:30 p.m. He said the plaintiff was there when he arrived and remained behind after he left Ponce.
The next day, February 15, he testified he went to the funeral, saw the plaintiff at the deceased’s home and at the cemetery, then returned to the deceased’s home, where he again saw the plaintiff, leaving him behind after he left at 9:00 p.m.
Carlos V. Davila, a lawyer employed by the Department of Justice at Puerto Rico, said he met the plaintiff and his family some years ago at a horse show. He testified that he received permission to spend the weekend of February 14 at plaintiff’s beach house about five miles from Ponce. That afternoon, while at the beach house, he was informed of Mrs. Wirshing’s death. On the morning of February 15 he called at the deceased’s home, where he saw the plaintiff.
*690 The next morning, he testified, he called at the office of the plaintiff, where he saw him and spoke to him. That evening he had dinner at the plaintiff’s home in Ponce with the plaintiff and his wife. On the next morning, Sunday, February 17, he said he again saw the plaintiff and his wife at Ponce.
Dr. Miguel A. Tulla testified that he specialized in surgery. He said that he has known the plaintiff and his wife socially and professionally since 1950.
He said that, on January 13,1951, with the aid of a Dr. Clavell, he performed a partial vasectomy upon the plaintiff at the dispensary of the Central Mercedita, the sugar refinery owned by plaintiff’s family. The operation was performed for the purpose of sterilization. He said that part of plaintiff’s vasdeferens was cut and the stumps ligated.
Dr. Luis C. Clavell testified that he was the plaintiff’s family physician, as well as the Central Mercedita Company doctor. He said that he was and is in charge of this dispensary, where he spends five afternoons' a week.
He testified that on Saturday morning, January 13, 1951, he assisted Dr. Tulla in the performance of the partial vasectomy on the plaintiff. He said he prepared the patient, the instruments and dressings, and injected plaintiff with penicillin after the operation. Later that day he made entries on a card, known here as Exhibit 9. He testified further that he made tests one month and two months after the operation, and again about ten months prior to the date of this trial, to determine whether the plaintiff had any live sperm, but found none. He gave it as his opinion that the plaintiff has been sterile from J anuary 13,1951, the date of the operation, to date.
The report of Dr. Robert S. Hotchkiss, a recognized urologist, offered by the plaintiff, indicates that he examined the plaintiff on November 5, 1955, at the instance of the guardian ad litem, and that plaintiff was sterile on November 5, 1955; that he (the doctor) was unable to state how long plaintiff had been sterile prior to November 5, 1955, nor when the vasectomy had been performed. He found evidence of scars on both sides of the scrotum.
Luis Muniz, an airline pilot, testified that he is married and the father of four children, and that he met the defendant in November of 1951. He said that he had sex relations with the defendant during the Christmas holidays of 1951, on February 22, 1952 and again on April 26, 1952.
Jose Mena, another airline pilot, testified that he met the defendant in October, 1951, saw her again a week later, when *691 he spent the night with her at a motel, and that he had relations with her at least twice a week thereafter until mid-March or the first week of April, 1952.
David Rodriguez testified that in November of 1951, while employed as a superintendent for the Fullana Corporation, he met the defendant in San Juan through a lady named Ida Otero, that about a week later he had sexual relations with her and that he had relations with her about once a month until March 3, 1952.
The deposition of Jose Mundo, father of the defendant, discloses that in January of 1952 he resided on a farm in Carolina, about fifteen miles from Santurce; and that the defendant returned to live at the farm in mid-July of 1952, when he noticed that she was pregnant.
He said that on August 12, 1952 he went with the defendant to the office of the plaintiff at Ponce where he spoke to the plaintiff and asked him to marry the defendant and recognize the child.
The plaintiff replied by showing him a family photograph with three or four children, said that he had such cases fixed at $1,000 or $2,000, and that he had a doctor who would perform the abortion.
He said he told him that he was not interested in money and that Mercedes would not consent to an abortion. Then, he testified that pursuant to an appointment he attended the meeting at Dr. Sanchez-Castano’s home in Carolina where there were present his brothers, Fernando Mundo, Antonio Mundo, the defendant, attorney Sanchez-Castano, Dr. Sanchez-Castano, the plaintiff, attorney Antonsanti and attorney Tormes.
At first, said Mr. Mundo, attorney Sanchez-Castano proposed that the defendant submit to an operation and then he offered him $10,000 or $12,000 to take the girl to New York, the money to be used to maintain her in case an abortion could not be performed. He said he finally accepted the $10,000 but before they left the defendant had to write a letter requesting help and exonerating the plaintiff.
He testified further that he personally had not seen his daughter from January 12, 1952 to mid-July, 1952.
The deposition of Fernando Mundo, uncle of the defendant, who attended the meeting on August 19, 1952, shows that this was the second time he met the plaintiff. The first time was at the end of March, 1952, when he saw the plaintiff get 'out of his car and walk almost into the yard of his, Mundo’s home at Santurce.
*692 On August 19 he said he heard attorney Sanchez-Castano tell his brother that the proposition was to send Mercedes to the United States and pay her expenses for a three-year period at the rate of $150 per month. He left Dr. Sanchez-Castano’s home at noon and neither saw nor heard anything further.
Benieio Sanchez-Castano, called by the plaintiff, testified that he was a lawyer admitted to the Bar of Puerto Rico.
He said that on Friday, August 15, 1952, Mr. Jose Mundo asked him to have his brother, Dr. Sanchez-Castano, make an appointment with the plaintiff concerning a very important matter. As a result, plaintiff, with his lawyers Orlando Antonsanti and Leopoldo Tormes, as well as the defendant, her father Jose Mundo, and her two uncles all met on August 19 at the doctor’s farm in the town of Carolina, Puerto Rico.
On that occasion he said he heard the plaintiff say to the defendant, “Why did you do this to me. You know I had nothing to do with it.” To which she replied, “ I had to say something to my father.”
Later he heard plaintiff say to Jose Mundo, “ What do you want? ”, to which Mundo replied, “ $10,000 ”, to which plaintiff said, “ This is a holdup.” Then he heard Jose Mundo say that he would take it to the newspapers.
When plaintiff decided to accede to this demand, he asked the plaintiff why he was giving Jose Mundo the $10,000. The plaintiff answered, “ You know that the name of Serrallos has always been above reproach. My father is seriously ill. If this gets in the papers, it will kill him. ’ ’
The deposition of Julio I. Veintidós, an assistant manager of the Banco Popular, shows that Ida Otero (referred to by the defendant as having been with her on plaintiff’s yacht during the February 15, 1952 week end) attended a masquerade ball given by the employees’ club of the Banco Popular on the evening of February 15, 1952.
The plaintiff, when recalled, testified further that he was not in San Juan during the week end of February 14 and 15, 1952; that he was in Ponce on February 14 when his aunt, Mrs. Wirshing, died; that he stayed at his aunt’s house all that day and night; that he attended the funeral on the 15th of February, went to the cemetery and returned about 5:00 p.m. to his aunt’s house where he remained until 9:00 or 10:00 p.m.
He said that the next morning he went to his office at the sugar mill at Ponce where, among other persons, he saw the witness Davila; that he again saw Mr. Davila that night at his home in Ponce, as well as the following morning. He said that ho *693 was not oií board his boat during the week end of February 15; that the following Tuesday, February 19, he was at San Juan to attend the meeting of the franchise owners of the Ponce basketball team and remained in San Juan spending the evening with Mr. Monagas, the park commissioner. He denied that he ever had sex relations with the defendant at the Caribe Hilton Hotel or any other place. He said that during the months of February and March, 1952, he did not stay at the Caribe Hilton Hotel more than once a week.
He testified further that on August 12, 1952, the defendant came to his office in Ponce; that he observed that she was pregnant and said to her, “ Did you get married? ”, to which she replied “ No He said, “ You are pregnant ”, to which she replied, “ That’s the reason I came to see you. I want you to help me. I am desperate.”; to which he said, “ Why pick on me ? You have friends. ”; to which she said, ‘ ‘ You can help me. ’ ’ He said, “ Well, I’ll think about it.”
He said that a few minutes later Mr. Mundo, father of the defendant, came into his office and asked him to marry his daughter, to which he said, “Are you crazy”? “I am a married man ”, and showed him a family photograph, after which Mundo asked, “ Won’t you help her? ”, and he replied that he would think about it.
On August 19, he went to Dr. Sanchez-Castano’s home in Carolina where he again saw the defendant and her father and where he spoke to her father and said, “What do you want of me ? ” To which he said, ‘ ‘ I want you to help my daughter. ’ ’ He replied “We went over that last week. What do you want? ’ ’ To which the father said, “ Money.” Plaintiff asked, “ What kind of money? ”, and the father said “ $10,000.” The plaintiff said, ‘ ‘ This is a holdup, ’ ’ and started to leave; whereupon the father said, “ If you don’t give me $10,000 I will have this on the front page of every newspaper. I will be back in an hour for your answer,” and left. He said that his lawyers .advised him against giving any money, but he said that his father was a very sick man and very proud of the family name and that lie was afraid a scandal would kill him, and that he would “ rather be taken for a sucker ” and pay the $10,000. When Mr. Jose Mundo returned, he said he had already drawn the check for $10,000 and gave it to his attorney, Mr. Antonsanti.
Plaintiff was informed that Mr. Mundo had declined to accept the check; whereupon he, together with his attorneys, left for Ran Juan to get the money. He returned and handed the cash to Mr. Antonsanti. He testified further that at Dr. SanchezCastano’s home he had said to defendant, “You know I had *694 nothing to do with your condition ”, to which she replied, “ I know, but I had to tell my father something.” He said that he found out that she had a baby some time in June of 1954 via a letter he received from his attorney.
Orlando Antonsanti, the attorney for the plaintiff, testified that he was present at Dr. Sanchez-Castano’s home on August 19 and that he heard the plaintiff say to defendant “ You know, I had nothing to do with you,” to which she said, “ I know. I told my father that, but I want you to help me.”
He said he heard the plaintiff say to Mr. Jose Mundo, “ What do you want,” to which Mr. Mundo replied, “I want some money.” He said, ££ What kind of money,” and Mr. Mundo said, “ $10,000,” at which point the plaintiff started to walk away, when Mr. Mundo said, ‘' Unless I get the money, I am going to spread this thing all over the newspapers,” to which the plaintiff said, ££ This is blackmail.”
He said he asked the defendant to write a note to the effect that the plaintiff had nothing to do with her pregnancy; that she asked what she should write, and he, Antonsanti, said ££ I am not going to tell you what to write; ’ ’ and that he did not dictate anything to her.
He testified that he first learned about the birth and registration of the infant in May of 1954, when the defendant’s husband called on him.
The defendant has taken the stand in rebuttal and denied that she had any relations with either Mr. Muniz, Mr. Mena or Mr. Rodriguez.
She denied ever saying at Dr. Sanchez-Castano’s home that the plaintiff was not the father.
She denied that her father ever threatened to take the matter to the newspapers.

Findings and Conclusions

The defendant’s testimony can be divided into three phases. First, that she was on the plaintiff’s boat during the week end of February 14 to February 17, 1952 where he became intimate with her; second, the secret meetings or trysts at the Caribe Hilton Hotel every Tuesday and Thursday for five or six weeks thereafter; and, third, the meeting at Dr. Sanchez-Castano’s home on August 19,1952 when plaintiff paid her $10,000 in cash.
. As to the first two series of events, I have found no corroboration whatever concerning or tending to prove any illicit acts between the parties, although there is evidence that the plaintiff was in her presence with others on two or three occasions, and a statement by her uncle Fernando that he once saw plaintiff *695 approaching the yard of his house where defendant lived in Santurce.
As to the events of the February 14 week end, and by way of alibi, the plaintiff has brought forth the witnesses Marijuan, a Catholic priest; Davila, a lawyer attached to the Department of Justice; Veintidós, an assistant bank manager; and Bodriguez, the engineer. As forceful an alibi as one could produce under the circumstances!
As to the meeting of August 19, we have the potent finger of suspicion in the payment by plaintiff to the defendant of $10,000 in cash. Here defendant’s version of the circumstances attendant upon the payment is supported by her father’s deposition. As against that we have the testimony of the two lawyers, one a former President of the Puerto Bico Bar Association, the other a former member of the Board of Examiners, to the admissions by the defendant of the plaintiff’s nonaccess, the threats of the defendant’s father, and the manner in which defendant supplied the exculpatory letter.
Ordinarily such evidence as to payment may indicate a connection with the act charged or some relationship with the defendant which had passed the casual- platonic stage. Yet like any conduct which may indicate a consciousness of guilt, it raises no legal presumption thereof. Its value depends to a large extent on the facts pointing to the motive which prompted it. Hence any explanation of the accused must be considered in connection therewith.
The testimony of these lawyers and the plaintiff raises a serious doubt in my mind as to the alleged ulterior motive which prompted the payment by the plaintiff of the $10,000. Under the circumstances I find that the payment of this money does not justify an inference of an admission of paternity.
Considering all the evidence before me, and disregarding the testimony of the two adulterous pilots and the unfaithful engineer concerning their illicit amours with the defendant, I am nevertheless forced to.the conclusion that the defendant has failed to establish by a fair preponderance of the credible evidence that the plaintiff had sexual relations with her, which caused the conception and birth of the infant on December 16, 1952.
I find that the credibility of the testimony of the witnesses, Toribio Marijuan, the priest, Julio Monagas, the park commissioner, Carlos Davila, Benecio Sanchez-Castanq and Orlando Antonsanti, the lawyers, and Julio Veintidós, the assistant bank manager, far outweighs that of the defendant supported by the depositions of her father and uncle.
*696 Moreover, the plaintiff has produced Drs. Tulla and Clavell who have testified as to the operation on plaintiff, as to his sterility, as well as the examinations of the plaintiff’s seminal finid and the determination of the absence of motile spermatozoa. This evidence stands uncontradicted. In addition, Dr. Hotchkiss has found him to be sterile today. The conclusion is therefore inescapable that the plaintiff was sterile from January 13, 1951 to date.
I, therefore, find that the plaintiff has sustained the burden of proving that he is not the father, and that the defendant and infant have failed to meet the burden under their counterclaims of establishing by a fair preponderance of the evidence that he is the father.
I, therefore, direct that a decree be entered declaring that the plaintiff is not the father of the infant defendant herein. The defendants’ counterclaims are dismissed. The action or request for support becomes academic, although it is my opinion that this court has no jurisdiction to entertain or grant an application for support in a paternity proceeding.
I further direct that the Department of Health amend the birth certificate of the infant by eliminating the name of the plaintiff.
I also find that the guardian ad litem heretofore appointed by this court is entitled to a fee of $7,500, and in addition the sum o'f $500, as and for trial expenses, to be paid by the plaintiff, and I so order.
This constitutes the decision of the court under section 440 of the Civil Practice Act.