The **TRAVELERS CORPORATION**, a body corporate of the State of Connecticut

v.

Harry **KAMINSKI**, Joseph H. Jackson, Mrs. Joseph H. Jackson, Timothy F. Davis, Samuel Walker, Unsatisfied Claim and Judgment Fund Board, Commissioner of Motor Vehicles (Unsatisfied Claim and Judgment Fund), United Services Automobile Association, a body corporate of the State of Texas.

Civ. No. 18337.

United States District Court
D. Maryland.
June 30, 1969.

Joseph H. Young and Paul V. Niemeyer, Baltimore, Md., for plaintiff.

Stanley J. Walcek and Giordano & Walcek, Marlow Heights, Md., for defendant Harry Kaminski.

Richard H. Lerch and Lerch & Huesman, Baltimore, Md., for defendants Joseph H. Jackson, Mrs. Joseph H. Jackson and Timothy F. Davis.

William C. Higinbothom, Baltimore, Md., for defendant Samuel Walker.

Francis B. Burch, Atty. Gen. of Maryland, and Alfred J. O'Ferrall, III and William E. Brannan, Asst. Attys. Gen., for defendant, Unsatisfied Claim and Judgment Board.

John H. Mudd and David M. Buffington, Baltimore, Md., for defendant United Services Automobile Assn.

FRANK A. KAUFMAN, District Judge:

In this proceeding, involving the coverage or lack of coverage of two automobile liability insurance policies issued by two insurance companies, Travelers [1] and United,[2] both companies seek declaratory relief. Diversity of jurisdiction is present.[3]

In September, 1965, Timothy Davis was stationed at Edgewood Arsenal, located approximately 20 miles from Baltimore, Maryland. He was nineteen years of age. His mother had married Joseph Jackson in 1953. There were close and warm family ties between the Jacksons and Davis. Davis lived with the Jacksons and their other children until he went into the service, and the Jackson home remained his home after he went into the service, up to and including, if not after, May 29, 1966.

On September 4, 1965, Jackson and Davis together visited a Baltimore Chevrolet agency and selected a 1965 Corvair, a demonstrator's model with some mileage on it. Davis signed the contract to buy the car. Jackson testified that the downpayment was $400.00 and that he (Jackson) put up $110.00 toward the downpayment and that Davis paid the rest from his own service earnings. Davis testified on deposition that the downpayment was $300.00 and that he and Jackson each put up $150.00, or "something like that." At trial he used the figure of $200.00 instead of $150.00.

The remainder of the purchase price was borrowed by the Jacksons from the Savings Bank of Baltimore. The car was titled in the names of the Jacksons. Davis' name did not appear on the title or the financing papers. Jackson, on deposition, testified that the Corvair was owned by Davis, "but I bought it in my name, because he wasn't old enough, not twenty-one, not twenty-one until December 28, 1966."

Also, on September 4, 1965, Jackson, without Davis, visited his insurance agent, Mr. Stephens, and asked him to add the Corvair on the Jacksons' then current owner's automobile liability insurance policy. That policy was at that time about to expire. Stephens, after his talk with Jackson on September 4, 1965, cancelled that existing policy and arranged for the issuance of a new owner's policy by Travelers, naming the Jacksons as insured and covering the 1959 Chevrolet and the 1965 Corvair as cars owned by the Jacksons. Jackson did not tell Stephens that Davis had any interest in the Corvair. Jackson told Stephens the Chevrolet and the Corvair would be used by himself and his wife. Jackson paid Stephens for the Travelers coverage. Jackson testified on deposition that he and Davis each paid for part of the Travelers insurance. Davis testified Jackson paid for that insurance.

In early October, 1965, Davis got in touch with Stephens and told Stephens

1. The Travelers Corporation, a Connecticut corporation with its principal place of business in that State. The parties have agreed that the pleadings are to be deemed amended so that The Travelers Corporation, the plaintiff herein, includes The Travelers Insurance Company and The Travelers Indemnity Company, both Connecticut corporations with their respective principal places of business in Connecticut, and both wholly owned subsidiaries of The Travelers Corporation.

2. United Services Automobile Association, a Texas corporation, with its principal place of business in that State.

3. Kaminski is a citizen of Pennsylvania; the Jacksons and Davis of Maryland; and Walker of Texas. While there is no specific showing that the amount in controversy exceeds $10,000, the proceedings instituted by Kaminski, referred to *infra* p. 13 of this opinion, allege damages substantially in excess of $10,000. In addition, it seems clear that the Travelers policy was sought by and issued to the Jacksons in accordance with the provisions of 6 Ann.Code of Md.Art. 66½ §§ 150(h), 151 and 122(c) (1967 Rep.Vol.). Section 122(c) requires minimum bodily injury limits of $15,000–$30,000. *See* generally Government Employees Insurance Company v. Lally, 327 F.2d 568, 569 (4th Cir. 1964).

that he wanted an operator's policy so that he could drive the Corvair on weekends. Davis did not mention to Stephens that he had any interest in the Corvair. Stephens testified Davis told him that Davis did not own a car but wanted to be able occasionally to drive cars of his Army buddies and also the Corvair. Stephens attempted to add an endorsement on the Jacksons' policy with Travelers to cover Davis as an operator. Travelers declined the added coverage. Stephens wrote on October 8, 1965 to the Maryland Automobile Assigned Risk Plan, requesting coverage for Davis and suggesting that the coverage be assigned to Travelers. However, the coverage was assigned not to Travelers but to United which issued a separate operator's policy to Davis on October 11, 1965. While the record does not specifically establish the same, Davis presumably paid Stephens for the operator's coverage issued by United to Davis.

In October or November, 1965, Davis obtained a learner's license card from the Commissioner of Motor Vehicles of the State of Maryland. Sometime in late December, 1965, a Maryland driver's license was issued to Davis.

Davis denies that he drove the Corvair between September and the date he obtained a learner's license. Between that latter date and the date Davis received his driver's license in late December, Davis drove the car about three nights each week when he was in Baltimore on passes from Edgewood. On at least several occasions during the period he held a learner's license, Davis kept the car overnight at or near Edgewood, without registering the car on the base. After Davis obtained his driver's license, he filed at Edgewood a letter of consent signed by one or both of the Jacksons, and thereafter was permitted by the military authorities to register the car at Edgewood and drive it and keep it on that base.

During the learner's license period, Davis and Jackson testified Davis drove the car only with a licensed driver as a passenger. However, it is clear that Davis had the use of the car during that period and that the Jacksons' supervision over that use was very loose. Jackson assumed that one [3a] of Davis' several Army buddies who was driving with Davis had a valid operator's license though he never saw any such license. Jackson permitted Davis to drive with Walker as a passenger though Jackson understood Walker had a Texas license and Jackson was uncertain whether that license was valid in Maryland. On one occasion, which Jackson clearly recalled but concerning which Davis professed no memory, Davis drove away from the Jacksons' residence during the learner's license period at the wheel of the Corvair with a Baltimore girl as the only passenger. Jackson knew the girl owned and drove her own car and assumed she had an operator's license. Jackson understood Davis drove the car on that occasion to Edgewood, kept the car there and drove back to Baltimore the next time Davis received a pass from Edgewood. Jackson did not know whether the girl drove with Davis to Edgewood or, if she did, how she returned to Baltimore.

Jackson testified he and his wife had no need for the Corvair themselves. They drove it occasionally before Davis got his learner's license and also a few times after that, particularly if it needed repairs or servicing. Jackson testified he put the car in the names of himself and his wife because the Chevrolet sales agency informed him that the bank which financed the car would not handle it if the car were registered in Davis' name, since the latter was a minor. Davis testified he understood a minor could not register a car in Maryland in his own name. Davis also testified the car was purchased originally as a family

3a. One of those buddies was Samuel Walker, one of the defendants herein, who was and is a resident of Texas. Walker was stationed in May, 1966, and before then, at Edgewood Arsenal, and was a buddy at that base of Davis.

car. Jackson testified it was purchased because Davis wanted his own car.

Until December, 1965, according to Jackson, and until February, 1966, according to Davis, Davis and Jackson each put up part of the monthly car payments to the bank. Davis' payments came from his own service earnings. Davis testified he gave the money to Jackson and Jackson paid the bank. During or before February, the Jacksons and Davis had a conversation about the car and thereafter Davis paid for all gas and oil for the Corvair (prior thereto Davis paid for gas and oil if he was driving the car and the Jacksons paid for gas and oil if they were driving the car) and all of each of the monthly payments.

Both Jackson and Davis testified that the Jacksons instructed Davis not to let any person other than Davis drive the car. Jackson testified he so instructed Davis for Davis' "own good" and because of the banking arrangements. When deposed, Jackson stated that he told Davis that if Davis let anyone else drive the Corvair, Davis "would probably get us in trouble, also himself too." Both Davis and Jackson agree that Jackson never saw anyone other than Davis drive the Corvair.

In January, Jackson noticed that a lot of mileage had been put on the car and suspected others besides Davis were using it. Jackson again so noticed in March and testified he asked Davis if others were driving it but that Davis denied any such use. Jackson testified that Davis has always told him the truth, and he accepted the statement Davis made to him. Davis testified he does not recall any such conversation with Jackson at any time. At the time of the accident in May, 1966, Davis testified that he guessed there were about 15,000 miles on the Corvair.

As with any such car in a three-person family unit in which the relationships are close, the car was available to the mother and step-father from time to time but, as Jackson testified, his wife drove infrequently and he (Jackson) had his own car. Davis, as a minor, thought he could not register the car in his own name. In addition, he understood the bank required the undertaking of one or both of the Jacksons. Further, Davis needed the consent of one or both of the Jacksons to keep the Corvair at Edgewood. This Court believes and finds that for those reasons and because they were his parents, Davis did not argue with the Jacksons when they directed him how to use and not to use the car. However, he then proceeded to use the car as he saw fit, and was permitted to do so by the Jacksons, who exercised minimal, and in any event completely ineffectual, control and supervision over Davis' use of the car.

Jackson testified that Davis came home frequently from Edgewood but on a number of occasions only to change his clothes and drive off again. Davis testified that before May 28, 1966, he never permitted the Corvair to be driven by anyone other than himself, except on a few occasions when Davis was on duty and one of several of his Army buddies drove it to nearby sandwich shops or the like to bring food back to the base for Davis and others. Jackson denied knowing before May 29, 1966 that Davis ever allowed anyone to drive the Corvair at any time. Davis testified that he never lent the car to Samuel Walker to drive other than to points near the base, until May 28, 1966. Walker testified on deposition that Davis lent the car to him to go to a cleaners off base for the sole purpose of taking or picking up clothes belonging to Walker; that he (Walker) drove the car into Baltimore four or five times, sometimes by himself, sometimes with Davis present; and that Alfred Lewis and Roland Henderson, soldiers stationed at Edgewood, also drove it, at least near the base. Davis testified Lewis and Henderson had their own cars and never drove the Corvair. This Court's observation of Davis, while testifying, causes this Court largely to discount Davis' testimony. In this Court's

opinion, Davis did not testify forthrightly.

On Saturday, May 28, 1966, Walker borrowed from Davis the 1965 Corvair. Walker had an overnight pass, and according to Davis, stated that he wanted to go into Baltimore with another Army buddy, Richard Beckwith, to visit the latter's home in Baltimore and to see some girls. Davis and Walker had been dating girls in Baltimore. They had originally met in August, 1965 at Edgewood and were in the same company, as was Richard Beckwith. Davis testified that he lent the Corvair to Walker after instructing Walker to take care of the vehicle, to replace any gas Walker used, not to drink, and to have the car back at Edgewood the following (Sunday) morning by the time Davis expected to get off duty. That latter time was 7:00 a. m. Davis testified that he knew that Walker drank sometimes. Davis also testified that on May 28, 1966, there was nothing mentioned about Walker driving to Cumberland, and that he (Davis) knew on May 28, 1966 that Cumberland was beyond the geographical area in which Walker, with an overnight pass from Edgewood, was permitted to travel.

Walker testified Davis told him on May 28, 1966 to take care of the car and to replace the gas but that Davis said nothing about Walker not drinking, or about any particular time to be back at Edgewood with the car, and that there was no conversation between Davis and himself about Walker driving to Baltimore. Walker stated that "Davis had entrusted the car to me and he didn't put any limitations where I was to go, so I didn't feel there was any need" to tell him about going to Cumberland. Walker testified that he and Davis had been dating girls in Baltimore and that Davis probably assumed that Walker would go to Baltimore. Walker, at the suggestion of Richard Beckwith, decided to drive Richard and himself to Cumberland to see James Beckwith. Walker first testified that James was Richard's brother; later that he was Richard's cousin; that James had been stationed at Edgewood; that James had recently been released from the Army prior to May 28, 1966 and was on that date in Cumberland; that Walker and Richard Beckwith had had discussions about James Beckwith being in Cumberland; and that when Walker and Richard Beckwith left Edgewood, they drove first to Baltimore to see Beckwith's mother, were there thirty or forty minutes and then drove to Cumberland to the home of relatives of Richard Beckwith. Walker stated he knew he was going beyond the area permitted by his overnight pass when he drove to Cumberland, and that he knew Davis would be off duty on Sunday and that he assumed Davis would want the car back for use on Sunday when Davis got off duty. Walker first testified that his discussions with Richard Beckwith about James being in Cumberland were not held in Davis' presence, but later testified that Davis may have been present at one or more such discussions.

At about 3:40 a.m. on Sunday morning, May 29, 1966, while returning to Edgewood from Cumberland, the car driven by Walker and a motorcycle being operated by Harry Kaminski, a resident of Pennsylvania, collided on U. S. Route 40 at a point 200 feet west of Maryland State Route 144, in or near Flintstone, Maryland. $940.00 of damage was done to the Corvair. After the accident, Walker was held in custody in Cumberland by the Maryland State Police until an Army officer from Edgewood arrived in Cumberland and took custody of Walker. The accident took place 150 miles from Edgewood at 3:40 a.m. This Court notes that there seemingly was still time for Walker to return to Edgewood before 7:00 a.m. if the accident had not occurred. Davis testified he understood Walker's overnight pass required him to be back at Edgewood for reveille on the following morning. It would appear that there was no reveille held or scheduled at Edgewood during the period in question on Sundays.

On May 28th, Davis thought Walker was planning to drive with Beckwith only to the latter's home in Baltimore. Davis may have known that Beckwith had relatives who lived in Cumberland but there was no discussion on May 28, 1966 about a trip to Cumberland. On May 28th, Davis placed no geographical limitation on the car's use. Perhaps Davis, if he had been asked or if there had been discussion about the point, would have forbidden Walker to drive out of the area in which Walker's overnight pass permitted him to travel. But no such limitation was ever discussed between Davis and Walker. The only time limitation which even Davis says he placed on Walker's use of the Corvair was on returning the car by the time Davis expected to get off duty the next morning. Walker's use of the car in driving to Cumberland was therefore not beyond the scope of Davis' permission since, but for the accident, he seemingly would have been able to drive the 150 miles from Flintstone to Edgewood within approximately three and one-half hours.

After the accident on May 29, 1966, the Jacksons refused to permit Davis to drive the car as long as it was titled in their names. Davis, believing he could not register the car in his own name until his twenty-first birthday and being forbidden by the Jacksons to use the car while it was titled in their names, decided to stop making payments on the car. The bank then called for payment of the loan and foreclosed its lien on the car.

Kaminski, alleging that he was injured in the accident with the car driven by Walker, has entered suit in this Court, in Civil No. 18167, for One Million Dollars ($1,000,000) for personal injuries and property damage, against Walker, Davis and the Jacksons. In that suit, Kaminski contends that Walker was under the influence of alcohol and was driving at an excessive rate of speed, and on the wrong side of the road, when the accident occurred. Travelers contends in this proceeding in which Travelers seeks declaratory relief, that be-

cause Walker did not have the permission of the Jacksons to operate the Corvair and also because Walker operated beyond the scope of Davis' permission, the Travelers policy affords no coverage to Walker. United, also seeking declaratory relief, takes the position that its non-owner's or operator's policy, issued to Davis, extends coverage only to Davis, and that even if it covers a permittee like Walker, that coverage does not exist in this case because Walker exceeded the bounds of Davis' permission. Walker, Kaminski and the State urge that Walker is covered under both policies.

Davis enlisted and served in the Army for about five years, both within and without the continental United States, including a tour of duty in Vietnam. He returned from Vietnam on January 17, 1969 and was thereafter discharged from the service. When this case was calendared for trial, counsel for all of the parties assumed that Davis would not be available for trial. They agreed that the depositions of Davis, Walker and Mr. Jackson would be received in evidence in a non-jury trial and that, in addition, Jackson's testimony, if he were called as a witness by one of the parties, would be heard during the trial. Jackson was called by United as an adverse witness without objection. After it was discovered during Jackson's testimony that Davis was back from Vietnam and in Baltimore, Davis was also called by United as an adverse witness without objection. All counsel agreed that, as in the case of Jackson, Davis' deposition as well as his testimony in court would be received in evidence. The only witness, other than Jackson and Davis, who testified at the trial was Stephens, the insurance agent who placed the two policies for the Jacksons and Davis. Walker was in Texas and did not appear at the trial. Mrs. Jackson did not testify either on deposition or at trial.

The Travelers policy was an owner's policy issued to the Jacksons and specifically covering and naming both their 1959 Chevrolet and the 1965 Corvair.

The policy contains the standard omnibus clause which provides in part:

A. The following are insureds under Coverage A:

(a) with respect to the owned automobile,

(1) the named insured and any resident of the same household,

(2) any other person using such automobile, provided the actual use thereof is with the permission of the named insured;

(b) with respect to a non-owned automobile,

(1) the named insured,

(2) any relative, but only with respect to a private passenger automobile or utility trailer,

provided the actual use thereof is with the permission of either the owner or a person having custody of the automobile with the permission of the owner;

(c) any other person or organization legally responsible for the use of

(1) an owned automobile, or

(2) a non-owned automobile, if such automobile is now owned or hired by such person or organization,

provided the actual use thereof is by a person who is an insured under (a) or (b) above with respect to such owned automobile or non-owned automobile.

Coverage A relates to both bodily injury and property damage.

Whether the Travelers coverage extends to Walker, a second permittee, requires this Court to determine:

(1) Whether Davis acted within the scope of his permission from the Jacksons in loaning the Corvair to Walker;

(2) Whether Walker operated the car within the scope of his permission from Davis; and

(3) Whether, if the answers to (1) and (2) are both in the affirmative, the Travelers policy extends to a second permittee, i.e., Walker.

■ Both the Travelers and the United policies were issued in Maryland. Therefore, Maryland law applies. Ohio Casualty Ins. Co. v. Pennsylvania Nat. Mut. Cas. Ins. Co., 238 F.Supp. 706, 708 (D.Md.1965), aff'd *per curiam*, 352 F.2d 308 (4th Cir.1965); Mt. Beacon Ins. Company v. Williams, 296 F.Supp. 1094, 1096 (D.Md.1969).

■ The question of who has the burden of proof in a declaratory relief case of this type should, it seems, be determined by state law. Hartford Accident and Indemnity Company v. Shaw, 273 F.2d 133 (8th Cir.1959); Liberty Mutual Insurance Co. v. Sweeney, 216 F.2d 209 (3d Cir.1954); 6A Moore, FEDERAL PRACTICE § 57.31[3] (1965). To date, no Maryland case has decided the issue of who has the burden of proof in a case brought by an insurance company seeking a declaratory judgment, as herein. The courts of other jurisdictions and the text writers appear to be divided. *See, e.g.*, Liberty Mutual Insurance Co. v. Sweeney, supra; Reliance Life Ins. Co. v. Burgess, 112 F.2d 234 (8th Cir.), cert. denied, 311 U.S. 699, 61 S.Ct. 137, 85 L.Ed. 453, rehearing denied, 311 U.S. 730, 61 S.Ct. 391, 85 L.Ed. 475, (1940); Travelers Insurance Co. v. Greenough, 88 N.H. 391, 190 A. 129, 109 A.L.R. 1096 (1937); 6A Moore, *op. cit.* § 57.31[2]; 20 Appleman, INSURANCE LAW AND PRACTICE § 11376 (1963); Borchard, DECLARATORY JUDGMENTS 404 *et seq.* (2d Ed.1941). In this case, it is not necessary to determine who has the burden of proof. For, regardless of upon whom the burden of proof is placed, that burden is one which can be discharged by meeting the preponderance of evidence test. In this case, this Court's mind is not in a state of even balance or even close to such a state, in connection with any of the material and controlling facts. *See* Liberty Mutual Insurance Co. v. Sweeney, *supra.*

■■ This Court finds that the preponderance of the evidence in this case clearly establishes that Davis was permitted by the Jacksons in May, 1966, to use the Corvair as he desired, and that Davis' loan to Walker was within the scope of that permission. The car, as between the Jacksons and Davis, in May,

1966, was for Davis to use as he desired.[4] In this case, it cannot be successfully contended that Davis' loan of the car to Walker on May 28, 1966 was beyond the scope of Davis' authority to use the car. Hopefully expressed instructions by parents against the loan of a car by their son cannot alone relieve the parents or their insurer of liability.[5] This Court also believes, after consider-

4. This is not a case in which the true owner, a minor, persuaded an adult friend to purchase a car with the minor's money and to procure an owner's policy in the adult's name, such as in Didlake v. Standard Ins. Co., 195 F.2d 247, 33 A.L.R.2d 941 (10th Cir. 1952), and an accident occurred when the car was being driven by a permittee of the minor; or a case in which an estranged husband took a car registered in his wife's name, and covered by a policy in which the wife was the named insured, to another city, such as in Selected Risks Ins. v. Miller, 227 Md. 174, 175 A.2d 584 (1961), and an accident occurred when the car was being driven by a permittee of the husband. In those cases, the courts held that the named insured had no control over the car and therefore could not have granted permission to use the car to the first permittee or through the latter to the second permittee. It can hardly be contended, in this case, that the Jacksons had no control over the automobile, and indeed Travelers has not taken such position. The Jacksons were not only the persons in whose name the Corvair was titled, which itself raises a presumption, albeit rebuttable, of ownership, but they were liable to the bank under the financing arrangements and themselves put up part of the payments for the car. They clearly were owners; if not sole owners, then joint owners with Davis. They were not, as parents, mere paper title holders as was the case with the father in Liberty Mutual Insurance Co. v. American Automobile Insurance Company, 220 Md. 497, 154 A. 2d 826 (1959).

5. In Farmer v. Fidelity & Casualty Company of New York, 249 F.2d 185, 188 (4th Cir. 1957), Judge Sobeloff wrote: "We know of no case, however, that goes to the extent of allowing an inference of permission in defiance of uncontradicted testimony, accepted in the District Court, that permission was not only withheld but that lending was specifically forbidden." In this case, this Court finds that no more than lip service was involved in the utterance by the Jacksons of the prohibition against lending by Davis. See also Schevling v. Johnson, 122 F.Supp. 87 (D.Conn.1953), in which the Court wrote (at 88–89):

The verdict also imported a finding that Toohey, the third-party plaintiff, was using the substituted automobile with the "permission" of the named insured, Ruppert Johnson. I think there was ample evidence from which the jury might have found that Charles had his father's implied permission to lend the Chevrolet. On this issue there was not only some evidence that the father knew of a course of conduct on Charles' part to lend the Chevrolet, but also and perhaps more important, the undisputed fact that the father made arrangements to put title to the Chevrolet in Charles and himself jointly and thereafter left Charles in sole possession and control thereof. The father testified that his only reason for taking a joint interest in the car was to prevent Charles from selling it without his permission. From this arrangement and in view of all the circumstances there was room for the inference that, except for power to sell, the father was content that Charles should have all the rights of an owner including the right to lend. True, the father testified that once, when the car was purchased, he told Charles not to lend it. But his testimony as to this was in language so couched that the jury, if indeed it believed his testimony, especially in view of all the evidence as to subsequent events might have interpreted his language as intended as the advice of a somewhat cynical father rather than as a limitation of authority imposed by a co-owner. In any event, and quite apart from any course of action known to the father, the jury might reasonably have concluded that on the issue of authority the father's long continuing surrender of complete possession and control to Charles was more convincing evidence than his original fleeting observation on the hazards of lending.

And if the jury found that the father authorized Charles to lend the Chevrolet it was certainly reasonable for it to infer that the authority extended to any "substituted" automobile in Charles' exclusive possession for the time being. This Court, as the fact-finder, has reached conclusions in this case not very dissimilar from those permitted to the jury by Judge Hincks in Schevling v. Johnson, supra.

ing all of the evidence in this case and particularly after observing and listening to Davis, that Davis loaned the car on other occasions to Walker and other Army buddies for their own personal use when they had passes and Davis was on duty. But even if the loan to Walker was the first of its kind, Davis' permitted dominion over the car was almost limitless and the supervision over his use of the car by the Jacksons was very loose and almost nonexistent. The Jacksons expressed their desires but did not exercise any control, either under their parental relationship with Davis or by the use of the whip hand they held under the financing arrangements, under Edgewood's requirement of parental consent for a car to be brought on that base, or because of Davis' and their own understanding of Maryland's limitations on registrations of cars in the names of minors. This Court also finds that the preponderance of the evidence in this case clearly establishes Walker's use of the car was, at the time of the accident, within the scope of Davis' permission. On May 28th, Davis permitted Walker to use the car as Walker desired so long as he brought the car back to Edgewood in time for Davis to have the car when he was scheduled to get off duty on Sunday morning. Davis placed no other restrictions on Walker's use except that Walker was to take care of the car and was to pay for gas and oil. While it has not been completely established that Walker, but for the accident, would have been able to arrive at Edgewood on Sunday, May 29, 1966, before or precisely at the time Davis got off duty that morning, and while therefore it is possible that Walker would have returned the Corvair a bit late, any such deviation by Walker from the use permitted by Davis would have been minor.

In Mt. Beacon Insurance Co. v. Williams, *supra*, 296 F.Supp. at 1095–1096 Chief Judge Thomsen of this Court wrote:

> Courts faced with cases involving deviation from the permission granted have adopted one of three rules: (1) the liberal or "initial permission" rule that if a person has permission to use an automobile in the first instance, any subsequent use while it remains in his possession though not within the contemplation of the parties is a permissive use within the terms of the omnibus clause; (2) the strict or "conversion" rule that any deviation from the time, place or purpose specified by the person granting permission is sufficient to take the permittee outside the coverage of the omnibus clause; and (3) the moderate or "minor deviation" rule that the permittee is covered under the omnibus clause so long as his deviation from the permissive use is minor in nature. American Home Assurance Co. v. Erie Insurance Exchange, et al., Md. [App.], 248 A.2d 887 (1969). See also 7 Appleman, Insurance Law & Practice, sections 4366–4368, pp. 308–327.

> Since the policy was issued in Maryland, Maryland law controls. Ohio Casualty Ins. Co. v. Pennsylvania Nat. Mut. Cas. Ins. Co., 238 F.Supp. 706 (D.Md.1965), aff'd per curiam, 352 F. 2d 308 (4th Cir.1965). The precise question has not been decided by the Court of Appeals of Maryland, although opinions of that Court and of the Fourth Circuit point to the proper basis of decision. For reasons stated below, this Court concludes that in construing the policy in this case the Court of Appeals of Maryland would adopt the so-called "minor deviation" rule. [Footnote omitted.]

For the reasons set forth by Judge Thomsen, this Court agrees that Maryland, when faced with the issue, will adopt the "minor deviation" rule. As suggested above, in this case, if there was any deviation by Walker, it was minor.

The question still remains as to whether a second permittee, such as Walker, is an insured under an omnibus clause in an owner's policy such as the one Travelers issued to the Jacksons, even if, as this Court finds, Davis acted within the scope of the Jacksons' per-

mission and Walker acted within the scope of Davis' permission. In Ohio Casualty Ins. Co. v. Penn. Nat. Mut. Cas. Ins. Co., 238 F.Supp. *supra* at 708 *et seq.*, Judge Winter, noting that the Maryland Court of Appeals had, at that time, declined to rule on the question, stated that "[t]he function of this Court, therefore, is to make an informed prediction of what the Maryland law will be when the matter is decided by the Maryland Court of Appeals." So doing, Judge Winter held that under Maryland law a second permittee does become an insured if the first permittee loaned the car to the second permittee within the scope of permission from the insured to the first permittee and if the second permittee used the car within the

scope of permission granted to him by the first permittee.

In Zurich Ins. Co. v. Monarch Ins. Co., 247 Md. 3, 8–9, 230 A.2d 330 (1967), Judge Finan noted Judge Winter's "informed prediction" in *Ohio Casualty* but declined to rule upon the second permittee issue because the scope of permission had clearly been exceeded. There has been no further word from the Court of Appeals since Judge Finan thus spoke. This Court considers itself bound by the Fourth Circuit's per curiam affirmance of Judge Winter's interpretation of the law of Maryland.[6] As noted above, this Court finds that Walker, a second permittee, acted within the scope of the use permitted to him by the first permittee, Davis, and that Davis, in making the

6. Other cases in which second permittee coverage has been held to exist include State Farm Mutual Automobile Insurance Co. v. Williamson, 331 F.2d 517 (9th Cir. 1964), and Standard Accident Ins. Co. v. New Amsterdam Casualty Co., 249 F.2d 847 (7th Cir. 1957). *See also* the cases discussed *supra* n. 5. In State Farm Mutual Automobile Ins. Co. v. Williamson, *supra*, the insured parents permitted their son to use the family automobile but expressly prohibited him from allowing anyone else to drive the car. He lent it to his girl friend, who had an accident. In holding that the friend (who later married the son) was an insured under the omnibus clause, Judge Merrill wrote (331 F.2d at 518–519):

> The father, mother and Kenneth [son] all testified that Kenneth had been expressly prohibited from permitting anyone else to use the car. Willene [the friend] testified that she knew of this prohibition.
> On the other side of the ledger were these facts:
> For eight months prior to the accident Kenneth had been provided with his own set of keys. During a period of two years, when he was attending Arizona State University, he had been given blanket authority to use the car to go to college.
> While Kenneth had been frequently cautioned respecting his use of the car and had operated the car under a set of rules laid down by his parents, during the years when he had been using the car he had frequently shown a disregard for these rules. He had, with

his parents' knowledge, received several citations for speeding, and had been involved in two to four accidents. He had, without permission and contrary to instructions, taken the car to Mexico for an overnight trip. His parents knew of his pattern of disregard. While they testified that he had been disciplined for violation of the rules (including depriving him of the use of the car for brief periods), they had thereafter continued to allow him to use the car.

Judge Merrill also said that it was up to the fact-finder to determine whether the initial grant of permission was broad enough to include an implied grant to the first permittee of authority to give another use of the automobile. On the facts of the *Williamson* case, when the second permittee was such a close friend, and when the parents knew of the history of past violations with only token reprimands, Judge Merrill said the jury could have reasonably decided that the actions and conduct of the parents were such as to signify their assent or lack of objection to the loan of the car to the second permittee.

In *Williamson*, the son was disciplined, albeit mildly, for his disregard of his parents' instructions. In this case, Jackson was content to let things ride when he suspected Davis was ignoring his advice not to permit anyone to use the car.

*See generally* Annotation on Omnibus Clause of Automobile Liability Policy as Covering Accidents Caused by Third Person Who is Using Car with Consent of Permittee of Named Insured, 4 A.L.R.3d 10 (1965).

loan to Walker, acted within the scope of the use permitted to him by the Jacksons. Accordingly, this Court holds that Walker is an insured under the Travelers policy. That holding, however, does not resolve the question of whether the United policy, as compared and contrasted with the Travelers policy, affords any coverage, though, in this Court's view, it has some bearing upon the question of the United coverage.

The United policy is an operator's policy. Section I, Coverages A and B of the policy itself, under the headings, "Bodily Injury Liability" and "Property Damage Liability," set forth liability to pay for damages "caused by accident and arising out of the ownership, maintenance or use of the automobile."

Section III, defining the insured, states:

> (a) * * * the unqualified word "insured" includes the named insured and, if the named insured is an individual, his spouse if a resident of the same household, and also includes any person while using the automobile and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is by the named insured or such spouse or with the permission of either * * *.

There are two endorsements specifically naming Timothy Franklin Davis. The first is headed "Non-Owner Policy" and provides, in part:

> It is agreed that such insurance as is afforded by the policy for Bodily Injury Liability, for Property Damage Liability * * * applies with respect to the use of any automobile by or on behalf of the named insured or his spouse if a resident of the same household, subject to the following provisions:
>
> 1. With respect to the insurance for Bodily Injury Liability and for Property Damage Liability the unqualified word "insured" includes (a) such named insured and spouse, and (b) any other person or organization

legally responsible for the use by such named insured or spouse of an automobile not owned or hired by such other person or organization. Division (a) of Insuring Agreement III, Definition of Insured, does not apply to this insurance.

> 2. The insurance does not apply:
>
> (a) as respects the named insured, to any automobile owned by the named insured and as respects the spouse of the named insured, to any automobile owned by the named insured, such spouse or a member of the same household other than a private chauffeur or domestic servant of such named insured or spouse * * *;
>
> (b) * * *;
>
> (c) * * *;
>
> (d) * * *.
>
> 3. If the named insured acquires ownership of an automobile during the policy period, the insurance hereunder shall nevertheless apply with respect to the ownership, maintenance or use of such automobile for a period of 30 days next following the date of such acquisition; provided that the insurance shall not apply beyond the effective date and time that any other insurance is available to the insured with respect to such automobile or would be available but for the existence of this insurance.
>
> 4. * * *.

The second endorsement is headed "Statutory Coverage for named Minors (Maryland)" and provides in part:

> It is agreed that such insurance as is afforded by the policy for Bodily Injury Liability and Property Damage Liability applies to the operation of any automobile by the minor named below in accordance with the provisions of Section 93 of Article 66½ of the Annotated Code of Maryland (1957 Edition), as amended, subject to the following provisions:
>
> 1. The insurance afforded by this endorsement applies only to the minor named below.

2. * * *

3. If the minor named below acquires ownership of an automobile during the policy period, the insurance afforded by this endorsement applies to the operation of said automobile by said minor. The insured named in the policy agrees to notify the company within thirty (30) days following the date of the delivery of the newly acquired automobile to said minor and to pay any additional premium required because of the application of the insurance to such newly acquired automobile. * * *

Counsel for the State and Walker have urged this Court to hold that the United policy covers Walker because Davis had acquired an ownership interest in the car by his contributions toward the payments made by Jackson to the bank. In this factual connection, it is noted that, during at least three or four months prior to the accident, Davis put up all of the money for those payments. But even if Davis had become a joint owner of the Corvair, with the Jacksons, prior to May 29, 1966, the United policy affords no coverage in this case to Walker.

The basis of the contention that the United policy covers Walker is that public policy so requires and supersedes contrary provisions of the policy. The courts of Maryland, as of other states, have held that legislative policy is directed toward the protection of members of the public from uncompensated injury caused by the negligence of a motorist. As set forth in 8 Ann.Code of Md. Art. 66½ §§ 150(h), 151, and 122(c), no motor vehicle can be registered in Maryland without its owner either (1) obtaining insurance qualifying under Section 122(c) or (2) paying a fee to the Unsatisfied Claim and Judgment Fund. Also, in 1965, when Davis obtained his learner's and then his operator's licenses, Section 93(d) provided that no minor could obtain a Maryland driver's license unless he first deposited proof of financial responsibility. In addition, other parts of Section 93, including Section 93(c), provided that the parents of such minor would be liable for the minor's negligent operation of a motor vehicle unless the minor deposited in advance with the Commissioner of Motor Vehicles proof of financial responsibility. One way to exhibit the financial responsibility proof referred to in the several parts of Section 93 was to obtain a qualifying insurance policy and to deposit evidence of it. In 1965, Section 93 included the following subsections:

* * * * *

(c) *When minor proves financial responsibility.*—In the event a minor deposits or there is deposited upon his behalf proof of financial responsibility in respect to the operation of a motor vehicle owned by him, or if not the owner of a motor vehicle, then with respect to the operation of any motor vehicle, in form and in amounts as required under the motor vehicle financial responsibility laws of this State, then the Department may accept the application of such minor when signed by one parent or the guardian of such minor, and while such proof is maintained such parent or guardian shall not be subject to the liability imposed under this section.

(d) *Compliance with proof of financial responsibility as required by § 122 of this article.*—On and after June 1, 1954, the application of any person under the age of twenty-one (21) years for an instruction permit or operator's or chauffeur's license shall be accompanied by such proof of financial responsibility as is required under the provisions of § 122 of this article. Nothing in this subsection shall be deemed or taken to affect in any way any person who, prior to June 1, 1954, has secured an instruction permit or operator's or chauffeur's license under the provisions of subsections (a), (b) and (c) hereinabove. * * *

Section 93(d) was repealed in 1968. So was Section 93(e), not herein relevant. The provisions of Section 93(c) have not been changed.

Section 122(c) establishes the minimum requirements for an owner's policy

which an owner must obtain unless he pays a fee to the Unsatisfied Claim and Judgment Fund. The requirements of Section 122(c) are not the same as those set forth in Section 131 of Article 66½. That latter section applies to taxicabs, commercial motor vehicles for hire, persons renting vehicles to others, and owners and operators of motor vehicles after certain accidents without insurance or after certain convictions or judgments. Mt. Beacon Insurance Company v. Williams, *supra*, 296 F.Supp. at 1099. Generally, the requirements of Section 122(c) are less strict than those of Section 131. Mt. Beacon Insurance Company v. Williams, *supra* at 1099; National Guild Insurance Co. v. Johns, 247 Md. 27, 230 A.2d 86 (1967); Citizens Casualty Co. of N.Y. v. Allied Mutual Ins. Co., 217 Md. 494, 501, 144 A. 2d 73 (1958).

Section 131 requires that a particular form of omnibus clause be included in the policy; Section 122 does not. Mt. Beacon Insurance Company v. Williams, *supra*, 296 F.Supp. at 1099–1100. And yet, as Judge Thomsen has noted in Mt. Beacon (at p. 1100): "In practice * * * the Insurance Commissioner [of Maryland] will not approve any insurance policy insuring an automobile unless such policy contains an omnibus clause satisfactory to the Commissioner." In this case, the omnibus clause in the Travelers policy issued to the Jacksons met the requirements of Section 131 even though Section 151 only required the Jacksons to provide Section 122(c) coverage (or in the alternative to pay a fee to the Fund).

Section 93(c) does not, as did Section 93(d), refer to the specific section which governs the type of policy to be deposited. Under Section 93(c), the possible liability of the parent or guardian is avoided if the required proof of financial responsibility is filed. On its face, Section 93(c) does not disclose whether it looks to Sections 122 and 140 or to Section 131. Judge Bell, in Government Employees Insurance Company v. Lally, 4 Cir., 327 F.2d 568, 572, n. 3, stated:

Ann.Code of Md. Art. 66½, §§ 93, 140 (1957), makes proof of a minor's financial responsibility a condition precedent to obtaining a driver's license.

On the other hand, in Kelsay v. State Farm Insurance Co., 242 Md. 528, 533, 219 A.2d 830 (1966), Judge Marbury wrote that Section 93 "requires minors to maintain proof of financial responsibility * * *. A policy is proof of financial responsibility when it meets the requirements of Section 131 of Article 66½."

Section 131 begins as follows:

A policy of insurance, *as that term is used in this article,* when offered as proof of financial responsibility under this article, shall mean an automobile public liability and property damage policy * * * [emphasis added].

Section 131 then goes on to provide the type of coverage required to meet its tests and provides in part:

A policy or policies of insurance shall provide insurance, in the name of the person insured, to apply to all motor vehicles owned by the person insured; and in addition thereto shall provide insurance, in the name of the person insured, to apply to any motor vehicle operated by, but not owned by the person insured.

(a) Such policy of insurance shall meet the requirements enumerated hereunder when:

\* \* \* \* \*

(3) It shall extend to insure any person using or legally responsible for the use of any motor vehicle described in the said policy, when such use is with the permission of the insured person named in the said policy;

(4) It shall provide insurance anywhere within the continental limits of the United States or the Dominion of Canada;

(5) It shall provide insurance for every insured person on account of le-

gal liability for damages arising out of the ownership, operation, maintenance or use of any motor vehicle explicitly described or appropriately referred to in the said policy; * * *.

Section 140 of Article 66½ provides as follows:

When the person required to give proof of financial responsibility is not the owner of a motor vehicle, such person may give proof of financial responsibility as required by this article by means of an operator's policy of insurance, insuring such person in the operation of *any* motor vehicle. [Emphasis added].

Section 2(a) (32) of Article 66½ defines "owner" to include "any person * * * owning a vehicle or having the exclusive use thereof * * *."

The Maryland courts have recognized the differences between an owner's policy and an operator's policy. See, *e.g.*, Citizens Casualty Co. of N. Y. v. Allied Mutual Ins. Co., 217 Md. 494, 502, 144 A.2d 73 (1958); Celina Mutual Casualty Co. of Ohio v. Citizens Casualty Co., 194 Md. 236, 243, 71 A.2d 20, 21 A.L.R.2d 605 (1950). *See also* Gray v. Citizens Casualty Co. of New York, 181 F.Supp. 21, 26 *et seq.* (D.Md.), rev'd on other grounds, 4 Cir., 286 F.2d 625, 88 A.L.R. 2d 989 (1960).[7] In this case, Travelers issued an owner's policy to the Jacksons; United issued an operator's policy to Davis. The United policy, by its very terms, covered operation by Davis and not by his permittee, and those terms should prevail and govern unless public policy requirements dictate otherwise. *See* Kelsay v. State Farm Insurance Co.,

*supra*; and United States Fidelity & Guaranty Co. v. Eckert, Docket 18P, Folio 412, Baltimore City Court (1961).[8] In *Eckert*, the operator's endorsement in an owner's policy was held to provide coverage to a second permittee (a friend of the son of the named insured) even though the first permittee (the son) loaned the car to the second permittee in violation of the directions of the insured (the mother of the first permittee). Judge Oppenheimer so concluded on the grounds that the provisions of Section 131 governed and required that result.

In *Kelsay*, Judge Marbury stated that certain of the provisions of the policy in that case, which policy had been filed as proof of financial responsibility of a minor under Section 93 (it is not clear whether under 93(d), or under both 93(c) and (d)), conflicted with the provisions of Section 131 and that such policy provisions could not stand against the public policy requirements of Section 131. Therefore, in *Kelsay*, the policy was said to provide coverage for the permittee of the insured operator. In *Kelsay*, the father (the insured under an owner's policy) permitted his daughter (in whose favor an operator's endorsement to her father's owner's policy had been issued) to have full use of a car he owned. The daughter was killed in an accident in the car while her boy friend was driving it with her permission. Judge Marbury held that the insurance coverage did not apply to a suit instituted by the parents and the administrator of the deceased because the latter had been an insured under the policy and was excluded by its terms from recov-

7. In Booth v. American Casualty Company, 261 F.2d 389 (4th Cir. 1958), the Court, noting that an operator's policy is of a different type than an owner's policy, remarked (at 392):

Consideration of the Act [South Carolina's Motor Vehicle Safety Responsibility Act] in its entirety discloses that it does not require that an insurance policy issued under the assigned risk plan must cover all risks under any and all circumstances.

8. An unreported nisi prius oral opinion by Judge Oppenheimer before his elevation to the Court of Appeals of Maryland. The opinion was transcribed by the official court reporter, and was followed by a letter commentary addressed by the Court to counsel dated January 17, 1962 which appears in the official Baltimore City Court file. Copies have been placed in the official court file in this case since the documents are unreported.

ery. In so holding, Judge Marbury noted (242 Md. at 533, 219 A.2d at 833):

On this appeal both parties agree that the answer to the first question here presented (*i.e.,* whether Kelsay [the boy friend] was an insured driver under the insurance contract by virtue of Section 131(a) (3) of Article 66½) should be in the affirmative. In so agreeing both parties concede that Judge Naughton was correct in ruling that since this policy was offered as proof of financial responsibility under Section 131 of Article 66½ then that article must prevail over that portion of the endorsement which specifically states that the insurance afforded by the endorsement applies only to Drinda [the daughter]. Drinda was "the insured person named" for the purposes of Section 131 because the endorsement to the policy specifically afforded her coverage under the policy, and thus Kelsay became an insured under the policy by virtue of that section since he was driving the automobile with the permission of Drinda.

In this case, as contrasted with the situation in *Kelsay,* a separate operator's policy was issued to Davis by United after Travelers declined to place an operator's endorsement, in favor of Davis, on the Jacksons' policy. Whether the United policy was procured to satisfy Sections 93(c) and (d) or merely 93(d) is not entirely clear on the facts in this case, though it seems certain that the major reason Davis wanted the coverage was to enable him to obtain a Maryland driver's license. *See* Government Employees Insurance Co. v. Lally, *supra,* 327 F.2d at 572, noting that purpose for obtaining an operator's endorsement for a

minor and also that another purpose was to secure coverage for the minor while driving a non-owned automobile.

In Gray v. Citizens Casualty Co., *supra,* Judge Chesnut held that Section 131 deals with owner's, not operator's, policies, and that an operator's policy issued to a husband afforded no coverage to his wife. In *Gray,* persons injured by the wife's negligent operation of a car owned jointly by the husband and wife obtained a judgment against the wife. The owners (the husband and wife) carried no owner's insurance. Prior to the accident, after the husband's license had been suspended, the husband had obtained an operator's policy and in so doing falsely informed the insurance carrier that he owned no car. Thereafter, his wife, while operating the car with him as a passenger, was involved in an accident. Judge Chesnut held the husband's operator's policy did not cover the wife's operation of the car with the husband's permission, that Section 140 and not Section 131 applied, and that therefore the requirements of Section 131 could not be superimposed upon the policy. (Specifically, *see* 181 F.Supp. supra at 31.) *Gray,* of course, in no way involved the application of Section 93 which relates to minors. *See also* Inland Mutual Insurance Company v. Stallings, 263 F.2d 852, 856–57 (4th Cir.1959), affirming the holding of Chief Judge Thomsen of this Court, 162 F.Supp. 713 (D.Md.1958), in which Judge Sobeloff, dealing with an operator's endorsement issued in favor of an insured whose driver's license had been revoked because of traffic violations, noted that the policy the driver desired and required was one which met the terms of Section 139(b) of the Code.[8a]

---

**8a.** Section 139 provides as follows:

§ 139. *Restriction in operating motor vehicles when proof of financial responsibility has been filed.*

(a) *Designation of vehicles.*—When proof of financial responsibility is required under §§ 118 and 119 of this article, and such proof is filed with and accepted by the Department, applying to motor vehicles owned by the

person filing the said proof, it shall be unlawful for such person to operate any other motor vehicle within this State, unless or until such other vehicle be specifically designated or appropriately referred to in the proof filed. The Department shall endorse notice of such restriction upon the operator's or chauffeur's license of such person. Violation of this section shall be deemed

Let us assume, *arguendo*, that Davis acquired sufficient ownership interest in the Corvair after the issuance of the United policy so as to bring into effect the provisions of paragraphs 3 of both of the endorsements to the United policy (pp. 492–493 *supra*). Let us also similarly assume that the failure of Davis to notify United within the thirty-day period, as required by paragraph 3 of the second endorsement (p. 493 *supra*), is of no importance. On that basis, the United policy would have provided coverage in May, 1966 for the operation by Davis of a car owned by Davis (other than the Corvair, or a car which, like the Corvair, is within the proviso in paragraph 3 of the first endorsement) because paragraphs 3 in the two endorsements override the exclusion in paragraph 2(a) of the "Non-Owner Policy" endorsement (p. 492 *supra*). But reading the policy and the endorsements as one document,[9] the United policy would not have afforded coverage to Davis for the operation in May, 1966 of the Corvair because the "provided that" clause in paragraph 3 of the first endorsement, by its terms, barred such coverage since the Jacksons' Travelers policy was in effect and made insurance available to Davis, as a resident of the Jackson household and also as a permittee of the Jacksons, with respect to the Corvair. Further, the United policy and the endorsement, considered together, do not provide any coverage for any permittee of Davis but only for Davis as an operator. Nevertheless, it is contended that since Davis had an ownership interest in the Corvair in May, 1966, Section 131 (particularly, the introductory words of its first sentence (p. 494 *supra*) and also subsection (a) (3) thereof (p. 494 *supra*)) applies and requires coverage under the United policy for Walker as Davis' permittee and that the public policy requirements of Section 131 must be read into and superimposed on the United policy. The answer to that attenuated argument is that in this case the Travelers policy, whether or not it was issued under Section 93(c), and whether or not Section 93(c) requires that a policy must, in order to satisfy the terms of Section 93(c), include a Section 131 omnibus clause, did in fact include it, whether by requirement of the Insurance Commissioner, as Judge Thomsen has suggested in a non-minor situation in *Mt. Beacon, supra* at 1100, or otherwise. The Travelers policy affords coverage for the accident in this case. Therefore, there is no public policy reason why the requirements of Section 131 should prevail in this case over the terms of the United policy.

This Court holds that the Travelers policy does, and that the United policy does not, provide coverage for Walker. Counsel may prepare a declaratory decree giving effect to the views set forth in this opinion.

---

a misdemeanor and upon conviction shall be punishable by a fine of ten dollars ($10.00) to one hundred dollars ($100.00).

(b) *Removal of restriction.*—Such operator or chauffeur so restricted may have such restriction removed by filing proof of financial responsibility as required by this article by means of an operator's policy of insurance, insuring such operator or chauffeur while operating any motor vehicle.

Section 118 provides that any owner or operator of a motor vehicle who is convicted of a violation of the motor vehicle law must maintain proof of financial responsibility or have the registration of any car registered in his name suspended. Section 119 provides that any person who has failed for a period of 30 days to pay certain judgments against him shall have his driver's license and registration certificates suspended until he satisfies or stays the judgment and gives proof of financial responsibility.

9. See Government Employees Insurance Co. v. Lally, *supra*; Rodda v. Nationwide Mut. Ins. Co., 230 Md. 38, 185 A.2d 380 (1962).